10 A.3d 448 (2010)
In re DAYVON G. et al.
No. 2009-131-Appeal.
Supreme Court of Rhode Island.
December 14, 2010.
*449 Thomas J. Corrigan Jr., Esq., Department of Children, Youth & Families, for DCYF.
Shella R. Katz, Esq., Court Appointed Special Advocate, for CASA.
Catherine Gibran, Office of the Public Defender, for Respondent.
Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

OPINION
Chief Justice SUTTELL, for the Court.
Kamesha G. (respondent) appeals from a Family Court decree terminating her parental rights to her children, Dayvon and Selena.[1] This case came before the Supreme Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After reviewing the record and considering the parties' written and oral submissions, we are satisfied that this appeal may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

I

Facts and Procedural History
On March 28, 2008, the Rhode Island Department of Children, Youth and Families *450 (DCYF) filed two petitions for the involuntary termination of respondent's parental rights with respect to Dayvon (date of birth May 13, 2005) and Selena (date of birth November 15, 2006). Based on G.L.1956 §§ 15-7-7(a)(2)(iii), 15-7-7(a)(3) and 15-7-7(a)(4), DCYF alleged three independent grounds for termination of parental rights: (1) respondent's chronic substance abuse, (2) the placement of the children with DCYF for at least twelve months with no substantial probability that the children could return to respondent's care within a reasonable period of time, and (3) abandonment. A trial on the petitions to terminate respondent's parental rights was held before a justice of the Family Court over the course of nine days in December 2008 and January 2009.
We extract from the voluminous record only such evidence as is necessary to our resolution of this case. Dayvon was placed in the care of DCYF at the time of his birth because respondent had tested positive for marijuana twice during her pregnancy.[2] Upon his release from the hospital, Dayvon was placed in a foster home, where he continues to reside. The respondent has since admitted to allegations of neglect, and Dayvon is committed to the care, custody, and control of DCYF.
The respondent engaged in substance-abuse services at the Providence Community Action Center, but was discharged shortly thereafter for noncompliance. DCYF social caseworker Denise De La Rosa met with respondent on August 17, 2005, to discuss case planning and services to be provided, including substance-abuse services, parenting services, and mental-health services. The respondent signed the case plan and Ms. De La Rosa provided her with a copy. The respondent reported to Ms. De La Rosa that she already was attending domestic violence counseling at the Blackstone Valley Community Action Program; after respondent reported this, however, she was discharged for missed appointments.
Ms. De La Rosa referred respondent to the Spurwink Family Support Center (Spurwink) for parent-aide services. The respondent also was referred to the Providence Center for the substance-abuse and mental-health service components of the case plan. The Providence Center completed an initial psychiatric evaluation of respondent in September 2005 and diagnosed her with mild depression. The respondent also received substance-abuse treatment in the Women's Day Treatment Program at the Providence Center. Although the Providence Center temporarily suspended treatment services because respondent had missed consecutive appointments, she eventually did graduate from the Women's Day Treatment Program.
The respondent's visitation schedule with Dayvon increased over time from brief supervised visits to visits that were longer, and, eventually, to unsupervised visits. Overnight visitation commenced around December 2005. Ms. De La Rosa testified that when she observed Dayvon after a weekend visitation with respondent, Dayvon was appropriately attired, looked pleasant, and was clean. Additionally, Ms. De La Rosa stated that she visited respondent's apartment numerous times, and it always was sufficiently arranged for a child and was immaculately clean.
In January 2006, however, visitations again were ordered to be supervised because of an incident when respondent and Dayvon could not be found for approximately *451 seven hours after an overnight visit.
On February 1, 2006, respondent was discharged from Spurwink for failure to attend a meeting. DCYF then referred her to St. Mary's Home For Children (St. Mary's) for parent-aide services, but she was terminated in July 2006, again for excessive absences. At respondent's request, she was given an opportunity to be reinstated at St. Mary's, but she failed to call to schedule an appointment. During this period, the visitations that occurred went well and were again increased to unsupervised overnight visits. The respondent was affectionate and appropriate with Dayvon. Ms. De La Rosa reported, however, that respondent was not consistent with adhering to the visitation schedule, to the extent that she was required to give advance confirmation before each visit.
DCYF social caseworker Darlene Altieri assumed responsibility for the case in August 2006. At this time, respondent had unsupervised visits with Dayvon from Friday afternoon through Sunday evening, and occasionally through Monday, depending on the foster parents' schedule. Ms. Altieri was concerned, however, about respondent's inconsistency with the weekend visits.
Upon first meeting with respondent, Ms. Altieri learned that she was eight months pregnant but had not received prenatal care. At a later meeting, respondent stated that she was receiving prenatal care from a clinic, but she refused to sign a release allowing DCYF access to her clinical records. The respondent also failed to provide proof that she completed a drug screen, as requested. Nevertheless, when respondent gave birth to Selena on November 15, 2006, both she and the newborn tested negative for drugs. The respondent was permitted to take Selena home from the hospital on November 22, 2006, after Ms. Altieri conducted an evaluation of respondent's apartment and determined that she had everything necessary to provide for the baby.
Spurwink agreed to reinstate respondent, and parent-aide services were back in place by the time Selena came into respondent's care. Jamie Nadeau, a family support worker for Spurwink, began working with respondent in December 2006. Ms. Nadeau worked with respondent at her home, helping to keep her calendar organized and overseeing her appointments. Nevertheless, Ms. Nadeau testified that respondent continued to miss appointments.
Ms. Altieri contacted John Parsons, Ph.D. to schedule another psychological evaluation of respondent, as called for in the case plan. An appointment was scheduled for December 20, 2006.
On Monday, January 15, 2007, "nobody was home" at respondent's house when the foster parents attempted to pick up Dayvon. DCYF instructed the foster parents to call the Providence and Woonsocket police and file a missing persons report. The next day, the foster parents received a phone call from a woman who identified herself as Victoria Tangbeh, an unapproved caretaker, who reported that she had Dayvon and would like the foster mother to pick him up. Ms. Tangbeh told the foster mother that respondent dropped Dayvon off on Sunday morning around 9 a.m., saying she had to give someone a ride to the airport, and that she had since been arrested in New York. Ms. Altieri and two Providence police officers went to the apartment, retrieved Dayvon, and returned him to his foster parents.
It was not until Wednesday, January 17, 2007, that respondent returned to Rhode Island with Selena. The respondent reported *452 to Ms. Altieri that she had gone to New York to pick someone up from the airport and that she had left Dayvon with Ms. Tangbeh and Selena with a woman named "Ms. Lillian," another unapproved caretaker.
As a result of this incident, Selena, who was two months old at the time, was removed from respondent's care and placed with Dayvon's foster parents, where she has remained. The respondent has since admitted to allegations of neglect, and Selena also has been committed to the care, custody, and control of DCYF. On January 25, 2007, an order was entered reducing respondent's visitation with Dayvon from weekend visits to one-hour, supervised weekly visits at DCYF.
DCYF social caseworker Ly Kue was assigned to the case in February 2007, around the same time that respondent decided to move to New York. Ms. Kue advised respondent that it would be best if she stayed in Rhode Island for visitation purposes, for services, and so that Ms. Kue could better work with her toward reunification. Nevertheless, respondent felt it was better that she go to New York because she had "family" there to support her, although no relatives were identified or located. Weekly visits were scheduled, and respondent indicated that she would take the bus or get a ride to Rhode Island to attend them. Upon respondent's request, and on account of the long trip from New York, visits eventually increased to an hour-and-a-half in length. Additionally, Spurwink services, which were interrupted by respondent's move to New York, resumed in March 2007.
In April 2007, respondent completed the evaluation with Dr. Parsons in Rhode Island.[3] Doctor Parsons diagnosed respondent with an anxiety disorder, major depressive disorder, cannabis dependence in remission, cocaine abuse in remission, borderline intellectual functioning, and a personality disorder. Doctor Parsons recommended that respondent be given a three-month period to cooperate with DCYF and to engage in further services, including psychotherapy, a parenting course, toxicology screens, and the Children's Museum. If respondent did not comply with the case plan and these services, Dr. Parsons recommended that permanency planning be considered.
In May 2007, Ms. Kue contacted a counselor, Alesa Simmons, at Elmcor in New York, requesting that respondent engage in substance-abuse treatment, including toxicology screens, a parenting course, and individual psychotherapy. Ms. Simmons prepared a treatment plan, made the appropriate arrangements, and sent monthly progress reports to Ms. Kue. The Brooklyn Parent Advocacy Network provided the parenting course component.
On July 6, 2007, Spurwink terminated its involvement with respondent again because of missed visits. Ms. Nadeau testified that from March to June 2007, respondent missed seven out of fourteen scheduled visits. Ms. Nadeau revealed that there were also concerns about respondent's decision-making and impulse control. Ms. Nadeau testified, however, that during the visits respondent did attend, she generally was attentive to her children, appropriately fed them, had appropriate toys, and redirected Dayvon when necessary. Ms. Nadeau also testified that the children had a positive reaction toward respondent.
*453 Ms. Kue likewise testified that when respondent did visit, she was "very appropriate" with the children and that the children gravitated toward her. Ms. Kue further testified that when Dayvon saw respondent "[s]ometimes he seem[ed] happy" and that when respondent initiated affection the children would respond by giving her hugs. Ms. Kue testified that, overall, respondent was good about letting Ms. Kue know her current address, but often failed to provide any employment verification, as called for in the case plan.
After moving to New York, however, respondent failed to visit on a consistent basis, blaming missed visits on a lack of money for the bus ride, missing the bus, missing her ride, or being sick. In November 2007, the court reduced respondent's visitation from weekly to every other week. Ms. Kue created updated case plans for Dayvon and Selena, still with the goal of reunification.
In February 2008, Ms. Simmons contacted Ms. Kue to advise her that respondent was being discharged from Elmcor because of her lack of attendance. The reports revealed that respondent's attendance had been poor; there were more absences than attended sessions. All of the drug screens from Elmcor were negative; however, respondent had missed numerous screens. The respondent moved back to Rhode Island during the summer of 2008.[4]
The foster mother testified that she always made efforts to accommodate respondent, changing the days and hours of the visitation schedule. Nevertheless, the foster mother testified that from March 30, 2007, to December 2, 2008, respondent cancelled or missed thirty-five visits.[5] More specifically, the foster mother testified that between January and November 2008, respondent missed a total of eighteen visits, which equated to nine months of missed visits out of eleven months.
On January 26, 2009, the trial justice issued a fifty-seven-page decision terminating respondent's parental rights on all three grounds alleged. Final decrees concerning both Dayvon and Selena were entered two days later, from which respondent has timely appealed.

II

Standard of Review
On appeal, "[t]his Court reviews termination of parental rights rulings by examining the record to establish whether the [Family Court] justice's findings are supported by legal and competent evidence." In re Ariel N., 892 A.2d 80, 83 (R.I.2006) (citing In re Rene B., 544 A.2d 137, 140 (R.I.1988)). "The trial justice's findings are accorded great weight and will not be disturbed on appeal unless they `are clearly wrong or the trial justice overlooked or misconceived material evidence.'" In re Brook Ann R., 994 A.2d 1241, 1243 (R.I.2010) (quoting In re Destiny D., 922 A.2d 168, 172 (R.I.2007)). "Natural parents have a fundamental liberty interest in the `care, custody, and management' of their children." In re Destiny D., 922 A.2d at 172 (quoting Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). "The trial justice must find that the parent is unfit before terminating [his or her] parental rights." In re Pricillion R., 971 A.2d 599, 604 (R.I.2009). "The natural parent's *454 right to due process requires that the state support its allegations by at least clear and convincing evidence." In re Victoria L., 950 A.2d 1168, 1174 (R.I.2008). "Upon a determination of parental unfitness, `the best interests of the child outweigh all other considerations.'" In re Brook Ann R., 994 A.2d at 1244 (quoting In re Pricillion R., 971 A.2d at 604).

III

Discussion
On appeal, respondent argues that the trial justice erred in terminating her parental rights based upon § 15-7-7(a)(3) (twelve months in state custody without a substantial probability of the children's safe return within a reasonable period), § 15-7-7(a)(2)(iii) (unfitness because of chronic substance abuse problem), and § 15-7-7(a)(4) (abandonment).
Section 15-7-7(a)(3) states:
"(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:
"* * *
"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"
The respondent argues that the trial justice's findings of unfitness based on DCYF's custody of Dayvon and Selena for more than twelve months, without a substantial probability of their safe return within a reasonable period of time, was "unclear" and improper. Although respondent concedes that DCYF made reasonable efforts toward reunification, she takes issue with the court's findings and conclusions as they relate to § 15-7-7(a)(3). More specifically, she says that she has been cooperative with the services, has always maintained contact, and that her mental health issues were not so significant as to prevent the safe return of her children. We have reviewed the record and are of the opinion that, contrary to respondent's contentions, the record is replete with evidence that "there is not a substantial probability that the child[ren] will be able to return safely to [respondent's] care within a reasonable period of time considering the child[ren]'s age[s] and the need for a permanent home[.]" Section 15-7-7(a)(3).
The trial justice made findings of fact by clear and convincing evidence that Dayvon was placed in DCYF custody upon his birth in May 2005 and that Selena was placed in DCYF custody in January 2007, approximately two months after her birth. DCYF spent three and a half years creating and effectuating case plans to assist respondent with reunification. The trial justice stated in her decision that the evidence "overwhelmingly" proves that respondent has failed to complete numerous services in the case plans, including mental-health counseling, substance-abuse treatment, and parenting classes, from numerous providers, including the Providence Community Action Program, the Children's Museum, the Brooklyn Parenting Advocacy Network, St. Mary's, Spurwink, Blackstone Valley Community Action *455 Program, and Elmcor in New York. The trial justice further found that respondent moved to New York in March 2007 for approximately fifteen months, during which period she missed the vast majority of her scheduled visits with the children. The trial justice found that, even after respondent returned to Rhode Island, she was inconsistent with visitation, demonstrating a lack of commitment to her children. The trial justice concluded that respondent's "failure to maintain regular contact with DCYF, her failure to comply with the case plans and, most importantly, her children, is without justification and renders her unfit to parent."
Doctor Parsons completed a psychological evaluation of respondent and testified as an expert witness. According to Dr. Parsons, respondent has had a traumatic life and is a guarded, suspicious person with symptoms of paranoia, and she lacks certain psychological coping skills. Further, she suffers from anxiety, has a personality disorder with borderline and self-defeating features, rationalizes to an excessive degree, and accepts very little responsibility for her actions.
Doctor Parsons opined that respondent's difficulty accepting responsibility, her poor coping skills, her low intellectual functioning, and the fact that she had yet to seek psychological counseling, created a risk pattern for the children.
In her decision, the trial justice noted Dr. Parsons' testimony that there are no additional services that DCYF could provide to aid respondent with reunification. The trial justice found that "[respondent's] mental health issues are such that she would not benefit from further counseling." The trial justice stated that throughout DCYF's involvement, respondent continuously has denied the existence of any problems, and she noted that there is no evidence that respondent is likely to change concerning her denial of mental health issues and concerning her marijuana use.
The trial justice concluded that respondent was unfit to parent Dayvon and Selena and that there was not a substantial probability that the children would be able to safely return to respondent's care within a reasonable period of time. This Court is satisfied that there is abundant evidence in the record to support this determination; the trial justice did not clearly err, nor did the trial justice overlook or misconceive material evidence.
Furthermore, the trial justice found that the children are bonded to their foster family, which is a pre-adoptive placement, and that it would be detrimental to remove them from the only family they have known since birth. The respondent does not challenge the trial justice's determination concerning the best interests of the children.
We appreciate that respondent articulates her love for her children and her desire to be a parent, but the fact remains that over an extended period of time respondent has not been able to demonstrate an actual ability to care for her children. "[A] parent's genuine love for their child, or an existence of a bond between parent and child, is not sufficient to overcome the child's fundamental right to a safe and nurturing environment." In re Brianna D., 798 A.2d 413, 415 (R.I.2002). The trial justice appropriately noted that "[t]his is a case where actions speak louder than words. The [respondent] may want to be reunified with the children but her actions do not support her desire to be reunified."
Finally, this Court "shall uphold the lower court's order for termination as long as [this Court] find[s] that the case [DCYF] presented under either one of the [three] grounds withstands appellate challenge." *456 In re William, Susan, and Joseph, 448 A.2d 1250, 1251 (R.I.1982). After reviewing the record and the trial justice's decision, we are fully satisfied that the trial justice did not err in finding that the children had been placed with DCYF for at least twelve months and there was no substantial probability that the children could return to the respondent's care within a reasonable period of time. Because we affirm the termination of the respondent's parental rights on this basis, we need not address the termination of the respondent's parental rights on the grounds of chronic substance abuse and abandonment.

IV

Conclusion
For the foregoing reasons, we affirm the Family Court decree terminating the parental rights of the respondent. The record shall be remanded to the Family Court.
NOTES
[1] We use the name "Selena" as it is spelled in the child's birth certificate. Her name appears as Salena and Serina on various other documents.
[2] At trial, respondent denied ever testing positive for marijuana in 2005, the year Dayvon was born.
[3] The psychological evaluation consisted of five appointments and one interactive session with Dayvon and Selena. The respondent failed to attend two appointments and was four hours late for another appointment.
[4] The respondent testified that she moved back as early as May 2008, but other testimony indicated that she came back as late as July 2008.
[5] It is noted that there are minor discrepancies between the foster mother's and Ms. Nadeau's accounts of missed appointments.