**In re JULIAN D.**

**No. 2009–271–Appeal.**

Supreme Court of Rhode Island.

April 11, 2011.

Thomas J. Corrigan, Jr., Esq., Department of Children, Youth & Families, for DCYF.

Mark B. Laroche, Esq., Hartford, for Respondent.

Susan M. Grant, Esq., Guardian Ad Litem.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

The respondent, Neftali Vallejo (respondent or Vallejo), appeals from a Family Court decree terminating his parental rights to his son, Julian D. (Julian). This case came before the Supreme Court for oral argument on January 31, 2011, pursuant to an order directing both parties to appear and show cause why the issues raised by this appeal should not summarily be decided. After considering the parties' submitted memoranda and oral arguments, we are of the opinion that cause has not been shown and that the issues raised by this appeal may be decided at this time. For the reasons set forth below, we affirm the decree of the Family Court.

## I

### Facts and Travel

On January 15, 2009, the Rhode Island Department of Children, Youth and Families (DCYF) filed a petition to involuntarily terminate Vallejo's parental rights to Julian.[1] Relevant to this appeal,[2] DCYF alleged two independent justifications for termination based on: (1) DCYF legal custody or care of Julian for at least twelve months, the offer or receipt of services from DCYF to Vallejo to correct the situation that led to Julian being placed, and no substantial probability that Julian could return safely to Vallejo's care within a reasonable period considering Julian's age and the need for a permanent home, G.L. 1956 § 15–7–7(a)(3); and (2) parental abandonment, § 15–7–7(a)(4). On June 2, 2009, the Family Court held a trial on this termination petition. Vallejo and Marybeth Camirand (Camirand), the social worker assigned to this case, testified.

Born on February 5, 2007, Julian is the biological son of Vallejo and Shantel Diogo

---

1. The petition sought to terminate the parental rights of both of Julian's parents. However, Shantel Diogo, Julian's biological mother, consented to voluntary termination and an open-adoption agreement on February 12, 2009. Accordingly, she is not a party to the instant appeal.

2. The DCYF petition of January 15, 2009, also alleged that termination was justified because there existed parental "behavior or conduct * * * seriously detrimental to the child of such a duration as to render it improbable for the parents to care for the child for an extended period of time." See G.L.1956 § 15–7–7(a)(2)(vii).

(Diogo). At the time of Julian's birth, Vallejo[3] was twenty-five years old and Diogo[4] had just turned sixteen. Although Vallejo testified that he was present at the hospital for the birth of his son, Diogo did not disclose a father's name for Julian's birth certificate at that time. After being discharged from the hospital, Diogo and Julian resided in Vallejo's mother's home, and Vallejo lived in the house next door. At the trial, Vallejo testified that he remained involved with his son's care during the first ten weeks of his life. In particular, Vallejo explained that he purchased baby bottles, formula, and diapers, frequently slept in Julian's bedroom and fed him at night, accompanied Diogo to Julian's doctor's appointments, and contributed financially to Julian's housing expenses.

DCYF's first involvement with Julian was ancillary to Camirand's assignment to Diogo, an arrangement that preceded Julian's birth. Initially, Julian was allowed to remain in Diogo's care. However, after Diogo went "AWOL"[5] with the child for five days, DCYF's involvement expanded to include Julian directly. DCYF learned of Diogo's unpermitted absence on May 23, 2007, and immediately placed him in pre-adoptive, nonrelative foster care where he remains to date. On May 25, 2007, DCYF filed a petition to adjudge that Julian had been neglected by his parents, Diogo and his then-unknown father.

After Julian's placement in foster care, Camirand continued as the social worker for both Julian and Diogo. Camirand testified at trial that in July 2007 Diogo admitted to her that Vallejo, whom Camirand previously had met under the pretense that he simply was Diogo's foster brother, actually was Julian's father. Thereafter, Vallejo was charged criminally for third-degree sexual assault[6] on Diogo. Also in July 2007, Vallejo was incarcerated at the Adult Correctional Institutions (ACI), but on an unrelated charge.

On September 13, 2007, while still at the ACI, Vallejo appeared before the Family Court on the earlier-filed May 25, 2007, neglect petition. Vallejo requested a paternity test at this hearing, and, when the test was not completed, he made a second request at a hearing in December 2007. The paternity test finally was completed in mid-January 2008 and confirmed that Vallejo indeed was Julian's father. On or about January or February 2008,[7] Vallejo was released from the ACI.

In March 2008 after his release from prison, Vallejo affirmatively inquired of DCYF about starting visitation with his son, and, in April 2008, Vallejo's biweekly supervised visits with Julian commenced. By all accounts, Vallejo's conduct during visitation with Julian was appropriate. The pair exchanged hugs and kisses and played together. Vallejo brought Julian food and toys and changed his diaper. Although Vallejo missed some visits, occasionally informing Camirand that he would

---

3. Vallejo's date of birth is July 23, 1981.

4. Diogo's date of birth is January 17, 1991.

5. AWOL refers to the status of being "[a]bsent without leave; missing without notice or permission." Black's Law Dictionary 157 (9th ed.2009).

6. Based on G.L.1956 § 11-37-6, "[a] person is guilty of third degree sexual assault if he or she is over the age of eighteen (18) years and engaged in sexual penetration with another person over the age of fourteen (14) years and under the age of consent, sixteen (16) years of age."

7. Although not particularly relevant to the crux of the appellate issues, this Court notes that testimony from the trial diverges as to Vallejo's exact date of release from the ACI. Vallejo testified that this date was February 24, 2008. Camirand testified that Vallejo was released in January 2008.

not be able to attend and on other occasions just not showing up, Julian and Vallejo did engage in fourteen, one-hour visits between April 2008 and October 2008.

In addition to arranging visitation, Camirand formulated a case plan for Vallejo that included completing a parent-child evaluation with John P. Parsons, Ph.D. (Dr. Parsons) and then abiding by any recommendations Dr. Parsons might make. Between May 2008 and August 2008, Vallejo met with Dr. Parsons four times, but failed to appear for three appointments and cancelled two others. Although Dr. Parsons was unable to complete the full evaluation because of the insufficient number of kept appointments, he gathered enough information to make recommendations for Vallejo. Classifying Vallejo's reunification with Julian as "high risk," Dr. Parsons's report strongly advised that given Vallejo's prior relationship and sexual contact with Julian's previously underage mother, Vallejo should commit to a sexual-offender-treatment program. Doctor Parsons also recommended that Vallejo not have any unsupervised contact with children or adolescents, including Julian, until treatment was completed. Vallejo disagreed with Dr. Parsons's recommendations and would not accept DCYF's offer to refer him to appropriate counseling. Under protest, Vallejo signed two case plans reflecting Dr. Parsons's recommendations, but he did not complete the objectives. At the termination trial, Vallejo maintained his stalwart position that he should not be required to attend a sexual-offender-treatment program.

During a visit with Julian on October 3, 2008, Vallejo informed Camirand that he had pled nolo contendere to the charge of third-degree sexual assault and had received a suspended sentence and probation. Vallejo testified at the termination trial that soon after entering this plea he was arrested and held on an alleged immigration violation at the Bristol County House of Correction in North Dartmouth, Massachusetts. Vallejo did not inform DCYF of his incarceration, and Camirand testified that her calls and letters to Vallejo's mother's home did not yield fruitful information as to his whereabouts. Accordingly, Vallejo's visitation with Julian ceased after October 3, 2008. Camirand testified that she did not determine that Vallejo was incarcerated until January 2009. Soon after this revelation, on January 15, 2009, DCYF filed the instant petition to terminate Vallejo's parental rights. Vallejo did not have any visitation with Julian during his incarceration nor did Vallejo seek to communicate with DCYF or his son. Camirand further testified that DCYF was unable to provide Vallejo with visitation because he was "incarcerated out of state" and, she added that she was unaware of DCYF ever providing visitation to an "out-of-state incarcerated father."

Vallejo remained incarcerated during the termination trial on June 2, 2009, but he was afforded a telephone conference line that enabled him to participate with his attorney in the proceeding. During the trial, Vallejo explained that he had filed a motion to vacate his plea of nolo contendere to the third-degree sexual assault. He represented that if the motion was granted, he would be released from federal custody.

On June 2, 2009, after the presentation of evidence, the trial justice rendered his decision from the bench. He first stated that "[t]here has been an admission that [Julian] has been in the care, custody and control of [DCYF] for at least 12 months." He then determined that Vallejo "really doesn't want the responsibility of taking care of the child" considering he initially "denied paternity" and has "the impression that he doesn't have to provide

support for the child until somebody asks him to or somebody orders him to." The trial justice noted that Vallejo was "steadfast" and "very appropriate" during visitation with Julian, but he diminished these positive assessments by remarking that "you'd have to be Simon Legree to be mean to a child at [Julian's] age." [8] He further found that Vallejo did not complete "sex offender evaluation and treatment" as recommended by Dr. Parsons and was facing deportation as a consequence of his plea to third-degree sexual assault. After recounting these factual findings, the trial justice stated that "this [c]ourt feels that [Vallejo] has abandoned or has deserted the said child." He articulated that clear and convincing evidence supported a finding of abandonment in Vallejo's case and furthermore, "it's in the best interest of this child that the father's rights be terminated." Accordingly, the trial justice ordered respondent's parental rights terminated. After the Family Court justice issued his oral ruling, it became apparent that Vallejo no longer was connected to the court by the conference line. His attorney nonetheless preserved his right to appeal.

· Vallejo filed a notice of appeal on June 8, 2009 [9] challenging the Family Court's decision. A day later on June 9, 2009, the trial justice entered a written "Termination of Parental Rights Decree" memorializing his bench decision. Within the decree, the trial justice recounted his oral rulings stating that "the child has been in DCYF care for at least twelve (12) months," "the father went to [a] parent/child evaluation with Dr. Parsons and missed numerous appointments," and "the

father did not agree with Dr. Parsons'[s] recommendations and refused to comply." He also articulated that "[1] [DCYF] had made reasonable efforts to prevent or eliminate the need for removal, * * * [2] continuation of said child in the home of the parent is contrary to the welfare of the child[,] [3] that the permanency plan goal of reunification is appropriate[,] [4] that the child may not be returned home safely[,] and [5] [ ] DCYF has made reasonable efforts to facilitate reunification." The trial justice additionally found that "the father has abandoned or deserted said child" and that "it is in the best interests of the child that the father's parental rights be terminated." Concluding that "the [s]tate has proven its case by clear and convincing evidence," the trial justice ordered Vallejo's parental rights terminated.

Approximately a month and a half after Vallejo's parental rights were terminated, a Superior Court order of July 22, 2009 granted his application for postconviction relief and vacated his plea to the third-degree sexual assault charge. Vallejo instead pled nolo contendere to an amended charge of simple assault and received a five-year deferred sentence. He represented to this Court that he currently is released from federal custody and is residing with his family.

## II

### Standard of Review

■■■ When reviewing a decree that terminates parental rights, "this Court applies a deferential standard." *In re Daniel D.*, 9 A.3d 651, 655 (R.I.2010) (citing *In*

---

8. The notably cruel and callous Simon Legree is the fictional slave owner in *Uncle Tom's Cabin.* Harriet Beecher Stowe, *Uncle Tom's Cabin* 373 (Alfred A. Knopf, Inc.1995) (1852).

9. Although Vallejo filed the appeal a day before the final decree terminating his parental rights was entered, his appeal "is nevertheless valid as final judgment was ultimately entered." *Poulin v. Custom Craft, Inc.*, 996 A.2d 654, 658 n. 4 (R.I.2010).

*re Brooklyn M.*, 933 A.2d 1113, 1121 (R.I. 2007)). "We 'examine[ ] the record to determine whether legally competent evidence exists to support the findings of the trial justice.' " *Id.* (quoting *In re Angelina T.*, 996 A.2d 623, 626 (R.I.2010)). As such, the trial court findings are given " 'great weight' on appeal and will not be disturbed unless it can be shown that they 'are clearly wrong or the trial justice overlooked or misconceived material evidence.' " *Id.* (quoting *In re Charles L.*, 6 A.3d 1089, 1093 (R.I.2010)). In conducting our review of the trial justice's decision, however, we are ever mindful that a parent's "fundamental liberty interest" is at stake and therefore, the state is required to prove its allegations by a clear and convincing evidentiary standard. *In re Dayvon G.*, 10 A.3d 448, 453, 454 (R.I.2010) (quoting *In re Destiny D.*, 922 A.2d 168, 172 (R.I.2007)); *see also* § 15–7–7(a).

## III

## Discussion

## A

### The Trial Justice's Basis for Terminating Vallejo's Parental Rights

The procedure governing termination of parental rights is set forth in § 15–7–7(a). Relevant here, DCYF petitioned for termination based on § 15–7–7(a)(3) [10] (requir-

ing proof of twelve months in DCYF custody or care, DCYF services offered or provided to correct the situation that led to the placement, and no substantial probability of the child's returning safely to parental care within a reasonable period) and § 15–7–7(a)(4) [11] (parental abandonment). Based on our review of the record, the trial justice determined that DCYF had proven both statutory branches for termination and also found that it was in the best interests of Julian that his father's parental rights be terminated. At the outset, this Court notes that the parties operate on the assumption that the trial justice's decision to terminate respondent's parental rights was based on abandonment alone. We disagree.

In his oral pronouncement from the bench on June 2, 2009, the trial justice made the factual findings necessary to establish termination based on the statutory ground involving twelve months in DCYF custody, but he failed to articulate clearly that he was terminating on this basis as well as on the ground of abandonment. However, when he formalized the written "Termination of Parental Rights Decree" on June 9, 2009, the trial justice recounted his oral findings and used statutory terminology sufficient to establish that he did, in fact, terminate respondent's rights based on the statutory ground involving twelve months in DCYF custody.

---

10. Section 15–7–7(a)(3) provides that: "[t]he court shall * * * terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:"

"[1] The child has been placed in the legal custody or care of [DCYF] for at least twelve (12) months, and"

"[2] the parents were offered or received services to correct the situation which led to the child being placed; [and]"

"[3] provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a

reasonable period of time considering the child's age and the need for a permanent home[.]"

11. Section 15–7–7(a)(4) establishes in relevant part that "[t]he court shall * * * terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that: * * * The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion."

In the past, this Court has acknowledged that "[g]enerally, when a discrepancy exists between an unambiguous oral pronouncement and a written judgment, the oral pronouncement will control. * * * [However,] if the pronouncement from the bench is ambiguous * * * the written judgment [may] be relied on to clarify the ambiguity." *State v. O'Rourke,* 463 A.2d 1328, 1332 (R.I.1983); *see also Arnold v. Lebel,* 941 A.2d 813, 817 (R.I. 2007) (noting that the "final declaratory order" served to "clarif[y] the bench decision"). In our view, the oral pronouncement was ambiguous with regard to the trial justice's conclusions as to the statutory ground involving twelve months in DCYF custody, but the written decree clarified his bench decision. Accordingly, we are satisfied that the trial justice terminated respondent's parental rights based on both statutory grounds and that he ruled with sufficient detail on that ground involving twelve months in DCYF custody to permit our review.

## 1

### Termination Based on § 15–7–7(a)(3)

### DCYF Legal Custody or Care for Twelve Months, DCYF Services Offered or Received, and No Substantial Probability of the Child's Returning Safely to Parental Care

■ We have held that (1) when a child has been in DCYF custody or care for at least twelve months and (2) the "parents were offered or received services to correct the situation which led to the child being placed," the Family Court can rely on § 15–7–7(a)(3) to terminate a respondent's parental rights, (3) "provided, that there is not a substantial probability that

the child will be able to return safely to the parent['s] care within a reasonable period of time considering the child's age and the need for a permanent home." *In re Dayvon G.,* 10 A.3d at 454 (quoting § 15–7–7(a)(3)). Beyond these express statutory elements, this Court also has held that § 15–7–7(a)(3) implicitly requires that the services DCYF offers or provides to a parent must constitute "reasonable efforts" aimed at "strengthening and encouraging the parental relationship, as described in § 15–7–7(b)(1)." *In re Christopher B.,* 823 A.2d 301, 315 (R.I. 2003) (concluding that § 15–7–7(a)(3) necessitates a DCYF showing "that the services offered amount to reasonable efforts on the part of the agency to correct the situation that led to the children's removal from the parental home").

At the termination trial, both parties agreed that Julian had been in the care, custody and control of DCYF for at least twelve months. The Family Court trial justice, in his oral pronouncement and written decree, likewise made the finding that the parties admitted that Julian had been in the "care, custody and control" of DCYF for a twelve-month period. This Court discerns no error in this finding and concludes that the trial justice properly determined that DCYF proved the first element of § 15–7–7(a)(3).

■ Concerning § 15–7–7(a)(3)'s second element, the offer-of-services requirement and the implicit evaluation of these services' reasonableness, Vallejo did not stipulate at trial that DCYF had offered or provided services to correct the situation that led to Julian's placement with the agency.[12] However, the trial justice ex-

---

12. The respondent's attorney acknowledged that "there's no way to not allege the child has not been in DCYF custody for at least that one-year period." DCYF's attorney then queried: "My further understanding is there's no stipulation to the part of the allegation about being offered or receiving services,

pressly found that Vallejo "went through a parent/child evaluation with Dr. John Parsons" and that Dr. Parsons recommended "sexual offender evaluation and treatment" for Vallejo. We note that the record clearly establishes that DCYF included Dr. Parsons's recommendation for sexual-offender counseling as one of Vallejo's case-plan goals and offered to refer Vallejo for these services. The trial justice further found that Vallejo declined to comply with this recommendation. In his written decree, the trial justice articulated the consequences of Vallejo's refusal to accept these treatment services from DCYF. First, he made the overarching statement that "the [s]tate has proven its case by clear and convincing evidence." He then explained that "the permanency plan goal of reunification [was] appropriate" and that "DCYF has made reasonable efforts to facilitate reunification." The trial justice, in his written decree, also found that the third element of § 15–7–7(a)(3) was met when he concluded that the "continuation of said child in the home of the parent is contrary to the welfare of the child" and "the child may not be returned home safely."

In evaluating this appeal, we focus on the trial justice's determinations with respect to the second and third elements of § 15–7–7(a)(3). Concerning the offer or receipt of services "to correct the situation which led to the child being placed," the trial justice found that DCYF's case plan, which included the offer of services in the form of sexual-offender evaluation and treatment, was "appropriate." Section 15–7–7(a)(3); *see In re Kristen B.*, 558 A.2d 200, 204 (R.I.1989) (affirming the trial justice's finding that counseling related to the parent's sexual abuse history constituted a proper offer of services). He also concluded that this case plan, and its included sexual-offender treatment, constituted

"reasonable efforts to facilitate *reunification*." *See In re Christopher B.*, 823 A.2d at 315 (requiring "a showing that the services offered amount to reasonable efforts on the part of the agency to correct the situation that led to the children's removal from the parental home, thereby strengthening and encouraging the parental relationship"). We note that "the concept of reasonable efforts is not a rigid standard, but one of some flexibility that must 'be defined by the particular facts and circumstances in a case.' " *In re Alvia K.*, 909 A.2d 498, 504 (R.I.2006) (quoting *In re Amber P.*, 877 A.2d 608, 618 (R.I.2005)); *see also In re Alan W.*, 665 A.2d 877, 878 (R.I.1995) (explaining that, although "[r]easonable efforts" are determined on a case-by-case basis, the efforts "must include case planning with the parent, arrangements for visitation, and keeping the parent informed of the child's well-being"). Based on Dr. Parsons's professional recommendations that Vallejo's reunification with Julian was "high risk" unless he received counseling to address his prior sexual relationship with Julian's underage mother, we cannot disagree with the trial justice that DCYF appropriately and reasonably offered this type of service to Vallejo. *See In re Christopher B.*, 823 A.2d at 315 (noting that "[a]fter all, if such services are to have any chance of success in correcting the situation that led to the children's removal from the family home, they must be 'reasonable' in the sense of being capable of remedying the particular problem(s) that caused the children to be removed"). For example, in *In re Rosalie H.*, 889 A.2d 199, 208–09 (R.I.2006), this Court held that "[t]he record contain[ed] ample evidence to support the trial justice's finding" that "the [parents] consistent[ly] fail[ed] to cooperate with DCYF in its efforts to achieve reunification," which

---

then?" To that question respondent's attorney answered: "That's correct."

required the parents to undergo sexual-offender counseling. We also agreed with the trial justice's conclusion "that [in offering these services] DCYF had fulfilled its obligation to make reasonable efforts at reunif[ying]" Rosalie and her brother with their parents. *Id.* Likewise here, DCYF offered Vallejo services that were aimed at ameliorating the "high risk" of reunifying him with his son and therefore were "reasonable." As such, we conclude that the trial justice's findings on this element were not clearly erroneous.

Finally, given the trial justice's dual findings that Vallejo refused to comply with sexual-offender treatment and that "the child *may not* be returned home," we also are satisfied that the trial justice more than adequately determined, as required by § 15–7–7(a)(3), that there was "not a substantial probability that the child will be able to return safely to the [parental] care within a reasonable period of time." *See In re Kristen B.*, 558 A.2d at 204 (holding that "both parents' constant denial of any sexual-abuse problem and their uncooperative attitudes within the group sessions cannot be excused [and] [t]heir lack of cooperation is particularly indefensible in light of the fact that each parent knew this therapy was the only avenue available to achieve reunification"). This Court is cognizant that, even after pleading nolo contendere to the charge of third-degree sexual assault in October 2008, Vallejo probably had competing concerns: on the one hand, his desire to reunify with his son and on the other hand, his trepidation that submitting to sexual-offender treatment could affect the success of his application for postconviction relief. Although these are logical considerations on Vallejo's part, this Court never has been persuaded that a parent's right against potential self-incrimination trumps a parent's responsibility to reunify with his child. *See In re Rosalie H.*, 889 A.2d at

207–08 (explaining that, although the parents "argue[d] that any participation in DCYF case plans [which included sexual-offender counseling] will subject them to criminal liability[,] [s]uch a wholesale rejection of the services provided to them, while their children remained in DCYF custody for over two years, demonstrates that the [parents] exalted their own interests over those of their children [and therefore] have failed to evince the 'responsibility, interest, and affection' that we deemed 'essential to the reestablishment of parental care'"); *see also In re Amber P.*, 877 A.2d at 616 (agreeing that the father, previously convicted of sexual assault, was put "on the horns of a dilemma," but disagreeing that the father's "failure to partake of sexual offender counseling" was justified because "at the same time, [he was] maintaining that he was innocent of sexual misconduct in his * * * appeal" of the sexual-assault conviction). We have stated that a "respondent['s] unwillingness to accept help clearly places [the child] at risk of emotional and physical harm." *In re Michael F.*, 665 A.2d 880, 882 (R.I.1995). "When the welfare of a child is concerned, [DCYF] and the court have the duty to request compliance with services offered and the completion of programs to be certain that respondents have, in fact, addressed their problems." *Id.* Given Vallejo's continued refusal to participate in sexual-offender treatment and the requirement that completing DCYF's case-plan goals was a precondition of reunification, we find no error in the trial justice's conclusion that Julian would be unable to return to Vallejo any time soon.

Based on the foregoing, this Court is satisfied that the record supports the trial justice's findings for each element of § 15–7–7(a)(3) and holds that he was not clearly wrong when he terminated Vallejo's parental rights based on this statutory provision.

## 2

### Termination Based on § 15–7–7(a)(4)

#### Abandonment

Section 15–7–7(a)(4) provides that "[t]he court shall * * * terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that * * * [t]he parent has abandoned or deserted the child." This section explains that "[a] lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion." *Id.* Unlike other statutory branches for termination, DCYF "has no obligation to engage in reasonable efforts to preserve and reunify a family" to satisfy the conditions of a petition based on § 15–7–7(a)(4). Section 15–7–7(b)(1).

Because this Court holds that the trial justice articulated a proper basis for the termination of Vallejo's parental rights in accordance with § 15–7–7(a)(3), we need not examine respondent's assignments of error with respect to the trial justice's fact-finding as to § 15–7–7(a)(4), abandonment. *See In re Ariel N.*, 892 A.2d 80, 86 (R.I.2006) ("Because any of the statutory requirements may be proven to support the petition, § 15–7–7(a), we need not review the trial justice's findings regarding the other allegation.").[13]

## B

### Best Interests of the Child

██ Once the Family Court justice establishes that the state has proven a statutory justification for terminating the relationship between a biological parent and child, here § 15–7–7(a)(3), he still must establish that "the best interests of the child outweigh all other considerations." *In re Dayvon G.*, 10 A.3d at 454 (quoting *In re Brook Ann R.*, 994 A.2d 1241, 1244 (R.I.2010)). We are "ever cognizant of the significance of severing the bond between parent and child," but resolutely appreciate that "it is in the best interests of children to have a safe and nurturing environment in which to live, learn and grow." *In re Daniel D.*, 9 A.3d at 657 (quoting *In re Alexis L.*, 972 A.2d 159, 170 (R.I.2009)).

In the instant case, the trial justice found that "it's in the best interest of this child that the father's rights be terminated." Indeed, the record shows that Julian has been placed with his pre-adoptive, foster family since May 23, 2007, when he was just fourteen weeks old and has remained with this family ever since. Julian is now four years old. According to Camirand, Julian is "thriving" in his pre-adoptive home and has established a "loving, mutual bond" with his foster family. Allowing this bond to grow is certainly in Julian's best interests. *See In re Diamond Y.*, 915 A.2d

---

13. Vallejo's prebriefing statement (filed pursuant to Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure) also contained an argument that his due-process rights were violated when the telephone conference line connecting him to the Family Court during his termination trial became disconnected just as the trial justice was rendering his ruling. However, at oral argument, Vallejo's attorney appeared to imply that he did not intend to pursue this contention of error. Even if the telephone line became disconnected during the rendering of the

Family Court's bench decision, we are of the opinion that Vallejo's attorney properly preserved his right to appeal and that no prejudice befell Vallejo in his absence. *See In re Ariel N.*, 892 A.2d 80, 85 (R.I.2006) (holding that the absent respondent's due-process rights were adequately protected at the termination of parental rights hearing because she was "represented by an attorney * * * [who] unquestionably took an active role in the proceeding"). As such, we are satisfied that no due-process violation occurred in this case.

1283, 1289 (R.I.2007) (holding that the child's "best interests were served by clearing the way for potential adoption by the family with whom she had lived her entire life"). Furthermore, the record shows that Vallejo had not complied with the case-plan goal of attending sexual-offender treatment nor did he indicate at the trial that he was amenable to fulfilling this mandatory requirement. This Court often has heralded that "[c]hildren should not be made to wait an indeterminate period for their parents 'to provide them with a safe and stable environment.'" *In re Alvia K.*, 909 A.2d at 505 (quoting *In re Douglas F.*, 840 A.2d 1087, 1089 (R.I.2003) and citing *In re Eric K.*, 756 A.2d 769, 772–73 (R.I. 2000)). Accordingly, because Julian has lived with his pre-adoptive, foster family for nearly his entire life and because Vallejo refuses to complete case-plan goals, we are satisfied that the trial justice was not clearly wrong in concluding that the best interests of Julian command the termination of Vallejo's parental rights.

## IV

### Conclusion

For the reasons explained in this opinion, we affirm the decree terminating the respondent's parental rights. The record shall be remanded to the Family Court.