**Supreme Court**

No. 2012-232-Appeal.
(05-899-1)
(05-899-2)

In re Lauren B. et al.  :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2012-232-Appeal.
(05-899-1)
(05-899-2)

In re Lauren B. et al.                    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.** The respondent, Daymon[1] Jones (respondent or Jones)

appeals from a Family Court decree terminating his parental rights to his two daughters, Lauren

B. (Lauren) and Stephanie B. (Stephanie). This case came before the Supreme Court for oral

argument on October 3, 2013, pursuant to an order directing the parties to appear and show cause

why the issues raised by this appeal should not be summarily decided. After considering the

parties' written submissions and oral arguments, we are of the opinion that cause has not been

shown and that the issues raised by this appeal should be decided at this time. For the reasons set

forth below, we affirm the decree of the Family Court.

## I

### Facts and Travel

Lauren and Stephanie first came to the attention of the Department of Children, Youth,

and Families (DCYF) in March 2005, when their mother tested positive for cocaine upon giving

---

[1] Jones's first name alternatively appears in the record as "Daymon" and "Damon." We refer to respondent here as "Daymon," the name which appears on the termination petitions and on Lauren's and Stephanie's birth certificates.

birth to Stephanie at Newport Hospital.[2] DCYF filed neglect petitions on April 4, 2005 against both parents with respect to both Lauren and Stephanie. Both children were committed to the care and custody of DCYF.

On April 9, 2010, DCYF filed petitions to involuntarily terminate Jones's[3] parental rights to Lauren and Stephanie.[4] Pursuant to G.L. 1956 § 15-7-7(a),[5] DCYF alleged the following as grounds for termination: (1) Jones's unfitness by reason of conduct seriously detrimental to Lauren and Stephanie; (2) the children's placement with DCYF for at least twelve months with no substantial probability that they will be able to return to Jones's care within a reasonable

---

[2] Lauren's date of birth is May 7, 2003. Stephanie's date of birth is March 31, 2005.

[3] The petitions also sought to terminate the parental rights of Sylvia Backus, the biological mother of Lauren and Stephanie. Ms. Backus subsequently consented to voluntary termination and an open adoption. At oral argument, it was suggested that Ms. Backus has withdrawn her consent. In any event, she is not a party in the instant appeal.

[4] DCYF had filed previous petitions to terminate parental rights. Those petitions were dismissed without prejudice. Since the earlier petitions are not relevant to this appeal, we do not discuss them here.

[5] General Laws 1956 § 15-7-7(a) provides, in relevant part:

> "The court shall upon a petition duly filed * * * and a hearing on the petition, terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:
>
> "* * *
>
> "(3) The child has been placed in the legal custody or care of [DCYF] for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home; or
>
> "(4) The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion."

period of time; and (3) Jones's abandonment of Lauren and Stephanie. Over the course of four days in June and July of 2011, a trial on the termination petitions was held before a justice of the Family Court. The only witnesses to testify at trial were Timothy Cronin, on behalf of DCYF, and respondent, on his own behalf. We summarize below the relevant and sometimes conflicting testimony of both witnesses.

## A

### Testimony of Timothy Cronin

Timothy Cronin testified that he has been the DCYF social worker on Lauren and Stephanie's case for approximately the past three years.[6] He explained that he was not assigned to the case until April 2008, about three years after it was opened. Mr. Cronin nevertheless attempted to provide some background as to Lauren and Stephanie's history with respondent. According to Mr. Cronin, Jones was convicted in 1995 of second-degree sexual assault and received a fifteen-year suspended sentence. He testified that Jones was not incarcerated at the time of Stephanie's birth in March 2005,[7] but was subsequently re-incarcerated at the Adult Correctional Institutions (ACI) in October 2005. Mr. Cronin believed that Jones was incarcerated for most of the time between October 2005 and early 2010, except for a brief period of liberty from approximately February 2008 to April 2008.[8]

When Mr. Cronin received the case in April 2008, Jones was permitted visitation at the ACI with Lauren and Stephanie at the discretion of DCYF. Mr. Cronin indicated, however, that

---

[6] The respondent was not present in court for direct examination of Mr. Cronin. He was, however, represented by counsel at all times during the termination trial.

[7] Later in his testimony, Mr. Cronin inconsistently stated that Jones was incarcerated at the time of Stephanie's birth.

[8] Mr. Cronin initially stated that Jones was released from the ACI in June 2010. He later indicated, however, that Jones's release occurred in January 2010.

no visits were taking place based on the recommendation of a clinician from Children's Friend and Service that Lauren and Stephanie not have contact with respondent. Pursuant to a Family Court order and a further recommendation of the clinician, Jones was later afforded one supervised visit with the children every three weeks, commencing sometime around May 2009.[9] Mr. Cronin testified that Lauren was usually willing to attend the visits with Jones. Stephanie, however, only attended "a couple" of visits because she was afraid of dogs present in the visiting room at the ACI. Mr. Cronin averred that he, the clinician, and Stephanie's foster mother all encouraged Stephanie to attend the visits, but Stephanie refused. He acknowledged that he did not visit Jones at the ACI at any time during Jones's incarceration.

Mr. Cronin explained that, in April and October of 2009, he formulated two[10] case plans aimed at reunifying Jones with Stephanie and Lauren. Under both case plans, Jones was to complete sex-offender and substance-abuse evaluations and follow any recommendations generated by those evaluations. Both case plans also specified that Jones was to refrain from discussing any DCYF issues during his visits with the children. The October 2009 plan required Jones to "[d]emonstrate the ability to resolve conflicts in a calm and civil manner." In addition, Jones was to obtain housing and maintain employment. Jones signed the April 2009 case plan but failed to sign the October 2009 plan.

Following Jones's release from the ACI in January 2010, he was permitted bi-weekly visits with Lauren and Stephanie at DCYF's offices in Bristol, Rhode Island. Mr. Cronin testified that a child-support technician from DCYF usually supervised the visits, except for one

---

[9] Pursuant to a March 15, 2006 Family Court order, Jones was previously allowed visitation with Lauren but not with Stephanie. A subsequent order on October 17, 2007 permitted visitation with both children but required DCYF to monitor the effect of the visits on Stephanie.

[10] At one point, Mr. Cronin also testified that he had developed one or more case plans with Jones upon Jones's release from the ACI in January 2010. Copies of those plans, however, were not admitted into evidence.

visit on February 3, 2010, which he personally supervised. Mr. Cronin described the February 3 visit as having gone "fairly well." He further testified that reports on subsequent visits from the child-support technician indicated that Jones did, "at times," interact appropriately with Lauren and Stephanie. Mr. Cronin's staff reported that Jones always displayed affection for the children.

In February 2010, Jones completed the sex-offender evaluation required under the case plans. That evaluation led to several recommendations for Jones, including sex-offender counseling, a polygraph examination, anger management classes, domestic violence classes, and counseling to assist him in accepting responsibility for his actions. Mr. Cronin asserted that Jones failed to follow through with these recommendations. He also asserted that Jones never completed a substance-abuse evaluation, as required under the case plans. Mr. Cronin expressly denied receiving any documentation to prove that Jones had undergone a substance-abuse evaluation. Despite Jones's failure to comply with the case plans, he was allowed to continue his bi-weekly visits with Lauren and Stephanie. According to Mr. Cronin, the visits continued in order to demonstrate that DCYF was making reasonable efforts to reunite Jones with his children and to afford Jones every opportunity to make use of the services that DCYF was offering.

Mr. Cronin testified that he encouraged Jones to follow through with the case plans' recommendations during a meeting at DCYF's offices on February 3, 2010. According to Mr. Cronin's recounting of the conversation, Jones reacted by insisting that "DCYF is going to do * * * things on his terms[,]" and should "grovel to him[.]" Mr. Cronin indicated that Jones had smelled of alcohol during that meeting. He also testified about two telephone conversations he had with Jones on March 11, 2010 and April 30, 2010, both of which ended with Jones's yelling and swearing. During the latter telephone conversation, Mr. Cronin again attempted to persuade

Jones to comply with the case plans and to make use of the counseling services. Mr. Cronin stated that Jones responded to his entreaties by dismissing the services as "a waste of time."

Jones's hostility towards DCYF reached a peak on May 28, 2010. According to Mr. Cronin's rendition of the events of that day, Jones became upset that DCYF was "brainwashing" his children after Stephanie referred to her foster parent as her "mother." He testified that Jones then made a statement to the effect of "watch what I bring into this building[]" or "[y]ou people need to watch out for what's going to happen[.]" Mr. Cronin interpreted Jones's words as a threat to blow up DCYF's offices. Lauren and Stephanie were present in the room when Jones made the alleged threats. Mr. Cronin stated that Lauren wet her bed for three consecutive nights after witnessing Jones's outburst.

On June 11, 2010, DCYF filed a motion in Family Court to suspend visitation. After conducting a hearing and receiving evidence, another Family Court justice granted DCYF's motion on August 16, 2010. A transcript of that decision was admitted into evidence at the termination trial. Mr. Cronin testified that, sometime after the motion was filed, Jones telephoned Lauren and Stephanie's foster mother, demanding to speak with the children. The foster mother refused, but Lauren overheard the argument. Mr. Cronin stated that Lauren again wet her bed for two nights following the telephone call.

As a result of the motion to suspend visitation, Lauren and Stephanie had not seen Jones for approximately one year at the time of trial. Mr. Cronin stated that, during that year, the children had been "great" and had done well at school. He emphasized that Lauren and Stephanie have lived together with the same foster mother for most of their young lives. Mr. Cronin noted that Stephanie in particular has never had a relationship with Jones. He

acknowledged that Lauren may have a "small bond" with Jones but believed that Lauren considers her foster mother to be her family.

**B**

**The Respondent's Testimony**

On the third day of trial, Jones testified on his own behalf. He expressed his frustration with DCYF in general and with Mr. Cronin in particular. He asserted that, while he was incarcerated, he made numerous attempts to contact Mr. Cronin, both by letter and by telephone. According to Jones, Mr. Cronin either did not answer his telephone calls or was in too much of a rush to adequately address his concerns. He also testified that he had had little to no communication with the three previous social workers assigned to his children's case. Jones believed that DCYF had been ignoring him since the case opened.

Jones described his visits at the ACI with Lauren and Stephanie as "the best time that I had behind bars." He recounted how he and the children "ran around," "played," and "showed love and affection for [one] another." Jones similarly testified that, during their visits at DCYF's offices, he and the children would "watch videos, build things, hug, [and] kiss." In particular, he testified that he and the children, accompanied by an employee from DCYF, were allowed to walk to a nearby store. Jones stated, however, that a few of his visits were cut short because Lauren and Stephanie's foster parent was late in bringing the children to the office. He claimed that he was never afforded an opportunity to make up the lost time with his children, despite DCYF's promises that he would be allowed to do so.

Concerning the incident of May 28, 2010, Jones denied that he threatened to blow up DCYF's offices. He claimed that his words were a threat to bring legal action against DCYF because he perceived DCYF as affording the foster family greater rights than he had with respect

- 7 -

to Lauren and Stephanie. Jones acknowledged that the Bristol police interviewed him about the alleged bomb threats, but he emphasized that no charges were filed. Jones also explained that in the days leading up to the incident, DCYF had refused to grant him permission to take the children to a nearby park during their next visit. He expressed his frustration with what he perceived as DCYF's arbitrary denial of his request.

Contrary to Mr. Cronin's testimony, Jones insisted that he had completed the substance-abuse evaluation required by the case plans. He specifically testified that he had undergone an evaluation at CODAC Behavioral Healthcare in Newport, Rhode Island. According to Jones, that evaluation indicated that he was not in need of substance-abuse counseling. With regard to his sex-offender evaluation, he asserted that the individual who conducted the evaluation was "nothing more than another agent for DCYF." Jones therefore demanded an "independent" evaluation. He expressed his disagreement with the evaluator's recommendation that he undergo sex-offender counseling. According to Jones, he was never required to complete counseling as a result of his 1995 conviction of second-degree sexual assault.[11] He maintained that he is innocent of the 1995 sexual assault and indicated that he has an application for postconviction relief pending in Providence Superior Court. Jones testified that he had participated in domestic violence counseling while at the ACI.

Jones admitted that he did not meet Stephanie for the first time until she was three-years old. Lauren, however, had lived with him and his aunt prior to her being taken into DCYF's

---

[11] Jones's testimony about his criminal history was somewhat confused. Consistent with Mr. Cronin's testimony, Jones explained that he had received a fifteen-year suspended sentence as a result of the 1995 conviction. He also indicated that he had received a suspended sentence for a separate "B & E," or breaking and entering, conviction. Jones then attempted to explain that "[t]he only time I went back to jail was a violation of that suspended sentence." He did not, however, indicate to which period of re-incarceration or to which suspended sentence he was referring. Jones also testified that his release in January 2010 was on bail pending appeal.

custody. Jones emphasized that he was capable of being a caring parent to Lauren and Stephanie. He described himself as a "family oriented person" who has already raised two adult children.[12] Jones expressed his concern that Lauren and Stephanie, who are African-American, might be raised by an Hispanic foster family.

On November 16, 2011, the trial justice issued a thorough forty-six-page written decision. In that decision, the trial justice reviewed the testimony and exhibits presented at trial. She adopted and incorporated by reference the findings made by the Family Court justice in the August 16, 2010 bench decision that granted DCYF's motion to suspend visitation. The trial justice then went on to find that Jones's "lack of cooperation with his sex offender recommendations, substance abuse evaluation, and anger management issues and his failure to respond to DCYF's efforts for almost six (6) years renders [sic] him unfit to parent Lauren and Stephanie." She noted that respondent "has done little towards reunifying with his daughters except show up for his limited, supervised visits." The trial justice further found that there was "ample evidence * * * that DCYF made more than reasonable efforts to reunify the family" but that respondent had "set up barriers to reunification[.]" She therefore concluded that DCYF had met its burden to prove by clear and convincing evidence that the children had been in the care of DCYF for at least twelve months, respondent was offered services to correct the situation that led to the children's being placed in care, and there was no substantial probability that the children could safely return to respondent's care within a reasonable period of time. In addition, the trial justice concluded that respondent had "abandoned or deserted the children by failing to comply with the terms of the supervised visitation[] and that his inability to comply with DCYF had led [the Family Court] to suspend his visitation * * * on August 16, 2010."

---

[12] Jones testified that he has a daughter, aged twenty, with whom he was residing at the time of trial. He also stated that he has an eighteen-year-old son.

Finally, the trial justice found that it is in Lauren's and Stephanie's best interests to terminate respondent's parental rights. She noted that "[b]oth Lauren and Stephanie are thriving in the only home Stephanie has known since birth," and "both are bonded to the foster family."[13] Accordingly, the trial justice granted DCYF's petitions to terminate Jones's parental rights to Lauren and Stephanie pursuant to § 15-7-7(a)(2)(iii), (a)(2)(vii), and (a)(3). A decree terminating respondent's parental rights entered on December 7, 2011. On December 23, 2011, respondent filed a notice of appeal.

Additional facts will be provided as needed to discuss the issues on appeal.

## II

### Standards of Review

"[N]atural parents have a 'fundamental liberty interest' in the care, custody, and management of their children." In re Steven D., 23 A.3d 1138, 1154 (R.I. 2011) (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). Moreover, the termination of a parent's rights is a "'grave, drastic, and irreversible action.'" In re Gabrielle D., 39 A.3d 655, 665 (R.I. 2012). Accordingly, due process requires that "a Family Court trial justice * * * find, by clear and convincing evidence, that a parent is unfit before terminating his or her rights to a child." In re Evelyn C., 68 A.3d 70, 77 (R.I. 2013) (citing In re Amiah P., 54 A.3d 446, 451 (R.I. 2012)).

On appeal from a decree terminating parental rights, "this Court applies a deferential standard." In re Julian D., 18 A.3d 477, 481 (R.I. 2011) (quoting In re Daniel D., 9 A.3d 651, 655 (R.I. 2010)). We "examin[e] the record to establish whether the [Family Court] justice's findings are supported by legal and competent evidence." In re Amiah P., 54 A.3d at 451 (quoting In re Victoria L., 950 A.2d 1168, 1174 (R.I. 2008)). The Family Court justice's

---

[13] At oral argument, we sadly learned that Lauren and Stephanie's foster mother is deceased. The children were placed in a different pre-adoptive home.

findings "are accorded great weight on appeal and will not be disturbed unless it can be shown that they are clearly wrong or the [Family Court] justice overlooked or misconceived material evidence." In re Charles L., 6 A.3d 1089, 1093 (R.I. 2010) (quoting In re Jose Luis R.H., 968 A.2d 875, 881 (R.I. 2009)).

**III**

**Discussion**

**A**

**Termination Pursuant to § 15-7-7(a)(3)**

Section 15-7-7(a) sets forth several independent grounds upon which the Family Court may base a decision to terminate a parent's rights. The Family Court may grant a termination petition under § 15-7-7(a)(3) when it is shown by clear and convincing evidence that a child has been in DCYF custody or care for at least twelve months and the parents were offered services to correct the situation that led to the child being placed in care, provided that there is no substantial probability of the child's being able to safely return to the parent's care within a reasonable period of time, considering the child's age and the need for a permanent home. In re Dayvon G., 10 A.3d 448, 454 (R.I. 2010) (citing § 15-7-7(a)(3)). In addition to these express statutory requirements, this Court has also held that § 15-7-7(a)(3) implicitly "requires a showing that the services offered amount to reasonable efforts of [DCYF] to correct the situation that led to the child's removal from the parental home, 'thereby strengthening and encouraging the parental relationship, as described in § 15-7-7(b)(1).'"[14] In re Jose Luis R.H., 968 A.2d at 882 (quoting In re Christopher B., 823 A.2d 301, 315 (R.I. 2003)).

---

[14] Section 15-7-7(b)(1) expressly requires a showing of "reasonable efforts * * * to encourage and strengthen the parental relationship" when DCYF seeks to terminate parental rights pursuant

## 1

## DCYF's Reasonable Efforts

The respondent argues that the trial justice erred in finding that there was clear and convincing evidence of DCYF's reasonable efforts towards reunification. He alleges that, instead of assisting him, DCYF ignored him and undermined his efforts to regain custody of his children. According to respondent, DCYF should have increased, rather than suspended, his visits with Lauren and Stephanie.

Although DCYF must show by clear and convincing evidence that it offered services that amount to a reasonable effort to correct the situation that led to the children's removal from the parent's care, see In re Christopher B., 823 A.2d at 315, we have never required DCYF to demonstrate that it undertook "extraordinary efforts to reunite parent and child[.]" In re Jose Luis R.H., 968 A.2d at 882 (quoting In re Diamond Y., 915 A.2d 1283, 1288 (R.I. 2007)). Instead, we have emphasized that "[t]he criterion of 'reasonable efforts' is 'subject to a case-by-case analysis [that takes] into account, among other things, the conduct and cooperation of the parents.'" In re Gabrielle D., 39 A.3d at 666 (quoting In re Nicole B., 703 A.2d 612, 618 (R.I. 1997)). We have recognized that reunification may not always be possible even when DCYF has made the requisite "reasonable efforts." In re Gabrielle D., 39 A.3d at 666. Accordingly, "we do not fault [DCYF] when the treatment received does not resolve the underlying problem or when a parent's recalcitrance to treatment precludes reunification." Id. (quoting In re Natalya C., 946 A.2d 198, 203 (R.I. 2008)).

In her written decision, the trial justice specifically found that DCYF had made all reasonable efforts to reunify Jones with Lauren and Stephanie. She reasoned that DCYF had

to § 15-7-7(a)(1), (a)(2)(i), (a)(2)(iii), or (a)(2)(vii). Section 15-7-7(b)(1) is silent on whether the "reasonable efforts" requirement applies to terminations under § 15-7-7(a)(3).

offered Jones "a myriad of services, all of which were within * * * Jones'[s] grasp," but Jones "chose not to avail himself of those services[.]" Our review of the record shows that there is ample evidentiary support for the trial justice's findings.

Mr. Cronin testified that he had prepared at least two case plans with the goal of reunifying Jones with his children. See In re Jose Luis R.H., 968 A.2d at 882 (reasonable efforts require DCYF to develop a plan to provide appropriate services to family). Those plans, admitted into evidence at trial, contained a number of requirements that Jones failed to complete, including sex-offender counseling, anger management classes, a substance-abuse evaluation, and other therapy to assist Jones in taking responsibility for his treatment needs.[15] Given that Jones's criminal history, including a conviction for sexual assault, and his incarceration were the primary reasons he lost custody of the children, the services offered were patently targeted to address the reasons that Lauren and Stephanie were placed into care.

Mr. Cronin tried to encourage Jones to take advantage of the proffered services on more than one occasion. His urging, however, was repeatedly met with Jones's fits of temper and outbursts of abusive language. Indeed, during his testimony, Jones acknowledged that he yelled and swore at Mr. Cronin. Mr. Cronin further testified that Jones accused the evaluator of bias, insisted that the services were a "waste of time," and expressed his determination to make DCYF "do * * * things on his terms." Considering respondent's recalcitrance and DCYF's persistence, we do not believe the trial justice erred in finding that DCYF had proved by clear and convincing evidence that it made reasonable efforts to correct the situation that led to Lauren and Stephanie being placed into care.

---

[15] We acknowledge that respondent completed domestic violence counseling.

In addition, the record reflects that DCYF made reasonable efforts to provide Jones with visits with Lauren and Stephanie. See In re Jose Luis R.H., 968 A.2d at 882 (reasonable efforts include "'suitable arrangements for visitation'"). The sex-offender evaluation recommended that a meeting to discuss the appropriateness of visits should be held only after Jones completed the necessary counseling. Nonetheless, the record shows that, despite Jones's failure to cooperate with the case plan, DCYF continued to provide Jones with visitation up until the incident on May 28, 2010 prompted DCYF to move to suspend visitation.[16]

The respondent suggests that DCYF fabricated the threats of May 28, 2010 to manufacture an excuse to further isolate him from his children. We can find no support in the record for respondent's suggestion. The transcript of the August 16, 2010 bench decision granting DCYF's motion to suspend visitation, admitted into evidence at trial, indicates that "[t]he motion * * * has been filed as a result of the father's accumulated actions over the past several months, as well as the reaction of Lauren and the interactions between * * * Mr. Cronin[] and the father, and * * * most importantly[,] the father's noncompliance with the service plan, which may * * * have assisted him in learning how to control his anger." In light of this evidence, we must disagree with Jones's assertion that the "reasonable efforts" requirement obligated DCYF to continue visitation. We certainly cannot agree that "reasonable efforts" required DCYF to increase visitation. See In re Amber P., 877 A.2d 608, 619 (R.I. 2005) (DCYF was under no obligation to provide visits after a Family Court order denied visitation and father failed to appeal from order); cf. In re Diamond Y., 915 A.2d at 1289 (in light of father's

---

[16] Under § 15-7-7(b)(2), DCYF's obligation to make reasonable efforts ceases once a termination petition is filed. The filing of a termination petition, however, does not limit the parent's right to visit the child while the petition is pending. See id. The relevant termination petitions in this case were filed on April 9, 2010, prior to DCYF's filing its motion to suspend on June 11, 2010.

failure to comply with case plans, any shortcoming of social worker in arranging visitation did not render DCYF's efforts inadequate).

## 2

### Substantial Possibility of Safe Return to Parent's Care

The respondent also contends that the evidence failed to establish that Lauren and Stephanie could not have safely returned to his care within a reasonable period of time. The respondent argues that his incarceration caused the children to come into DCYF's care and suggests that, upon his release, there were no further obstacles to reunification.

The April and October 2009 case plans identified several areas of risk that respondent needed to address before the children could safely return to his care. Those areas included risks of substance abuse and sexual offense, as well as a history of violence and criminal behavior. As discussed supra, the case plans and the sex-offender evaluation contained a number of required treatments that respondent failed to complete. Jones's unwillingness to accept the help that DCYF was offering clearly jeopardized Lauren and Stephanie's safe return to his care. In re Michael F., 665 A.2d 880, 882 (R.I. 1995) (a parent's "unwillingness to accept help clearly places [the child] at risk of emotional and physical harm").

Jones contends, however, that his failure to comply with the recommendations of the sex-offender evaluation was not a barrier to reunification because the recommended treatment was unnecessary. The respondent points out that he was never required to undergo sex-offender counseling as a condition of his probation and he has not re-offended in the sixteen years since his conviction. He further claims that the evaluator's lack of impartiality undermines the authority of the recommendations.

A parent's self-assessment that he or she poses no risk of sexual harm to his or her child is not an adequate assurance that the child may safely return to the parent's care. See In re Raymond C., 751 A.2d 281, 283 (R.I. 2000) (upholding trial justice's finding that mother's denial of risk of sexual abuse made reunification problematic). Irrespective of whether sex-offender treatment was required as a condition of Jones's probation, DCYF determined that compliance with a sex-offender evaluation was necessary to ensure that Lauren and Stephanie could safely return to respondent's custody. "When the welfare of a child is concerned, [DCYF] and the [Family] [C]ourt have the duty to request compliance with services offered and the completion of programs to be certain that respondent[] ha[s], in fact, addressed [his] problems." In re Michael F., 665 A.2d at 882. The evidence at trial unequivocally demonstrated that Jones had no intention of following through with the recommended treatments. Faced with such evidence, we decline to find any error on the part of the trial justice in determining that respondent's failure to complete the recommendations of the sex-offender evaluation made a safe reunification unlikely. See In re Julian D., 18 A.3d at 485 ("Given [father's] continued refusal to participate in sexual-offender treatment and the requirement that completing DCYF's case-plan goals was a precondition of reunification, we find no error in the trial justice's conclusion that Julian would be unable to return to [father] any time soon.").

The respondent next argues that substance abuse was not an obstacle to reunification because he completed an evaluation which indicated that he was not in need of counseling. Contrary to respondent's assertion, Mr. Cronin testified that he never received any proof that respondent had undergone the required substance-abuse evaluation. The trial justice apparently chose to credit Mr. Cronin's testimony because she found that Jones had failed to comply with the case plan's requirement of cooperating with and completing a substance-abuse evaluation. In

light of Jones's failure to submit any documentary evidence to rebut Mr. Cronin's testimony, we cannot say that the trial justice was clearly wrong in finding that Jones had failed to address the issue of substance abuse. See In re Daniel D., 9 A.3d at 656 (noting that it was trial justice's "prerogative to find [the social worker's] version of events more credible than [father]'s").

We further note that both the trial justice and the Family Court justice who granted DCYF's motion to suspend visitation expressed particular concern about respondent's inability to control his anger and self-regulate his behavior. The trial justice specifically found that respondent had failed to demonstrate that he was capable of resolving conflicts in a calm and civil manner, as required under the October 2009 case plan. She emphasized that respondent "chose to deny his anger and violence issues and instead blame others or diminish its impact on his ability to care for his children." In fact, the record shows that anger management counseling was one of the recommended treatments that Jones failed to complete. The evidence of Jones's vehement hostility towards Mr. Cronin and his threats on May 28, 2010 in front of the children further demonstrate that Jones's uncontrolled anger was an obstacle to the children's safe return to his care.

Based on the above evidence,[17] we discern no error in the trial justice's finding that there was no substantial probability of Lauren and Stephanie safely returning to respondent's care within a reasonable period of time. In sum, we are satisfied that the record supports the trial justice's findings that the elements of § 15-7-7(a)(3) were proven by clear and convincing evidence.

---

[17] Jones was also required to secure employment prior to regaining care of Lauren and Stephanie. Although Jones testified that he was employed at the time of trial, Mr. Cronin testified that he never received any proof of employment from Jones in the months preceding the filing of the termination petitions.

# B

## Abandonment under § 15-7-7(a)(4)

In her written decision, the trial justice wrote that she was terminating respondent's parental rights pursuant to § 15-7-7(a)(2)(iii), § 15-7-7(a)(2)(vii), and § 15-7-7(a)(3). The parties assume, however, that the trial justice's decision was based on a finding of unfitness under § 15-7-7(a)(3) and a finding of abandonment under § 15-7-7(a)(4). The respondent argues that there was insufficient proof to support the trial justice's finding of abandonment under § 15-7-7(a)(4).

In the formal "Termination of Parental Rights Decree," the trial justice made findings and used statutory language indicating that termination was based on both § 15-7-7(a)(3) and § 15-7-7(a)(4). See In re Julian D., 18 A.3d at 482 (holding that termination decree recounted oral findings and used statutory terminology sufficient to establish statutory grounds upon which trial justice based termination). Nonetheless, we need not determine the additional grounds upon which the trial justice based her decision. Clear and convincing proof of any one of the statutory grounds in § 15-7-7(a) suffices to grant a petition to terminate parental rights. In re Ariel N., 892 A.2d 80, 86 (R.I. 2006) (citing § 15-7-7(a)). Since we uphold the trial justice's decision to terminate the respondent's parental rights under § 15-7-7(a)(3), we need not address the respondent's argument that the trial justice erred in finding that DCYF had met its burden of proving abandonment under § 15-7-7(a)(4). See In re Julian D., 18 A.3d at 486 ("Because this Court holds that the trial justice articulated a proper basis for the termination of [the father's] rights in accordance with § 15-7-7(a)(3), we need not examine [the father's] assignments of error with respect to * * * § 15-7-7(a)(4), abandonment." (citing In re Ariel N., 892 A.2d at 86)).

## IV

## Conclusion

For the reasons stated in this opinion, we affirm the decree of the Family Court terminating the respondent's parental rights. The record shall be remanded to the Family Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     In re Lauren B. et al.

**CASE NO:**     No. 2012-232-Appeal.
(05-899-1)
(05-899-2)

**COURT:**     Supreme Court

**DATE OPINION FILED:**     November 4, 2013

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**     Newport County Family Court

**JUDGE FROM LOWER COURT**:

Associate Justice Karen Lynch Bernard

**ATTORNEYS ON APPEAL:**

For DCYF:  Karen A. Clark
Department of Children, Youth & Families

For CASA:  Shella R. Katz
Court Appointed Special Advocate

For Respondent:
Janice M. Weisfeld
Office of the Public Defender