May 26, 2021

**Supreme Court**

No. 2019-443-Appeal.
(P 18-4947)

In re Gelvin B.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Gelvin B. :

Present: Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Long, for the Court.** The respondent mother, Melissa B. (mother or respondent), appeals from a decree of the Family Court, issued pursuant to G.L. 1956 § 15-7-7(a)(3), terminating her parental rights to her son, Gelvin. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

**Facts and Procedural History**

Gelvin was born on June 16, 2017, at Women and Infants Hospital. Within days of his birth, the Department of Children, Youth, and Families (DCYF or the department) filed a neglect petition in an underlying companion case, P 17-2160,

- 1 -

and placed Gelvin into nonrelative foster care. He has remained in the custody of DCYF since that time.

On October 2, 2018, DCYF filed the present petition in Family Court to terminate the parental rights of Gelvin's mother and father.[1] The Family Court thereafter considered the neglect petition along with the termination petition. A summary of facts accompanied the petition to terminate parental rights; the summary detailed mother's history with the department, including the prior removal of her three older children from her care, as well as the criminal charges brought against her concerning one of the older children.

The trial in mother's case, both for neglect and termination of her parental rights, began on July 8, 2019. DCYF asked the court to take judicial notice of mother's plea of nolo contendere to a criminal charge of neglect of a child and submitted into evidence the three service plans developed to that point. The first service plan, dated August 2017, stated a goal of reuniting Gelvin with mother, along

---

[1] A hearing was held on February 27, 2019, during which a social worker from DCYF, Jennah Carpenter, testified that Gelvin Castro had been identified as the child's father by the mother and confirmed through DNA testing. DCYF developed three case plans for the father with the goal of reunification, none of which the father availed himself of. Ms. Carpenter further testified that the father had no visitation with the child since his birth and had provided no financial support. The trial justice noted that the father had been served by publication and failed to appear at that hearing, and the trial justice defaulted him and terminated his parental rights. Gelvin was placed in nonrelative foster care while mother's case remained pending. The father has not appealed to this Court.

with a concurrent goal of adoption. Mother was given weekly, supervised visitation with Gelvin and was referred to the Boys Town Visitation Program (Boys Town). Her plan requirements included completion of a parent/child evaluation; continued participation in the Healthy Families America home-visiting program in which she was enrolled; being "open and honest with her therapist"; and refraining from any criminal activity.

Mother's second service plan, developed in March 2018, included unsupervised visitation but otherwise identified similar requirements for mother, such as completion of a parent/child evaluation; engaging in recommended mental health treatment and counseling; and refraining from criminal activity.

The third and final service plan, dated September 2018, modified Gelvin's permanency goal to adoption with a concurrent goal of guardianship and, once again, required supervised visitation. However, mother's requirements under the service plan remained similar to those in the prior plans.

During the trial, DCYF solicited testimony from mother and two DCYF caseworkers assigned to the family. Mother testified that, when she found out she was pregnant with Gelvin, she went to the Women and Infants Behavioral Clinic and engaged in the Healthy Families program. She explained that she continued attending the Healthy Families program after Gelvin's birth and placement into foster care. Her weekly visitation with Gelvin progressed to two times per week—

once each week at Boys Town, and once each week with Gelvin's foster mother. Later, visitation became loosely supervised, with the foster mother as the supervisor.

Mother also testified about what precipitated the return to weekly supervised visits in the third service plan. In March 2018, she was scheduled to have an overnight visit with Gelvin, but she was arrested the day before and held for thirty days at the Adult Correctional Institutions. She explained that she "had a message passed on" through a third party to let DCYF know her whereabouts.[2] After her release from the ACI, DCYF did not refer mother to any additional services, despite her requests. Mother stated that she sought referrals after her arrest because she knew she had "messed up" and "wanted to do whatever [she] could to fix it[,]" but never received a response from the department.

Mother also testified about an incident on July 11, 2018, when, after an anonymous call to the DCYF hotline, the police discovered Gelvin in her home unsupervised. At the time, Gelvin was placed with a paternal great-aunt who facilitated the unauthorized visit. Mother acknowledged that she knew it was against the court order but explained that she missed her son and "wanted to be around him[.]"

---

[2] Mother gave testimony in her own defense in addition to testifying as part of DCYF's case-in-chief.

Mother discussed the services in which she was enrolled to make her fit to parent Gelvin. She found a therapy program at Family Services, attended therapy there for two years (less a five-month lapse in insurance), and remained engaged in therapy at the time of the trial. She testified that she was "opening up more" with her therapists, which was helping her.

Lastly, mother testified that she requested a referral to a parent/child evaluation but did not receive one. Mother denied ever declining such a referral. She also testified that her DCYF caseworker, Jennah Carpenter, was difficult to reach; she said they met face-to-face only when in court.

Ms. Carpenter testified that she had worked with the family since before Gelvin was born. She explained that mother needed to work on her judgment in parenting, as well as her outstanding mental health and substance issues; she conceded that mother was working on the latter issues and engaging in counseling when Gelvin was born. Ms. Carpenter did not think mother completed an updated mental health evaluation, as the service plans required, or resumed drug screens after being released from the ACI. She testified that mother was inconsistent and guarded with therapy; she further explained that she did not refer mother to other services because mother "need[ed] to engage in counseling * * * so changing her counselor wasn't going to do anything." Ms. Carpenter also testified that DCYF asked mother to participate in a parent/child evaluation with Gelvin but that she declined.

Additionally, on examination by counsel for the CASA guardian *ad litem*, Ms. Carpenter stated that, although mother was required to refrain from criminal activity, she was arrested twice in March 2018.

Ms. Carpenter explained that Gelvin had been in his current, nonrelative placement since July 2018, and was "very bonded" with his foster family. Moreover, according to Ms. Carpenter, that home could be a permanency source for Gelvin if mother's parental rights were terminated.

Jane Ahles, Ms. Carpenter's supervisor at DCYF, also testified. Ms. Ahles confirmed Ms. Carpenter's testimony regarding mother having declined a parent/child evaluation.

In closing arguments, mother contended that she successfully completed Boys Town, the only service to which she had been referred, and that DCYF failed to continue reunification efforts after her arrest. She argued that DCYF based its petition to terminate her parental rights on her arrests for nonviolent crimes, which, according to mother, is an insufficient basis to terminate an individual's parental rights.

DCYF and the CASA guardian *ad litem* both argued that DCYF had made reasonable efforts to reunite mother with her son.[3]

---

[3] Counsel for DCYF also took issue with mother's inability to recall exactly when visitation became "loosely supervised." Counsel argued, "If I had not had my child in that length of time * * * that date would be burned in my memory[.]" We note

The trial justice issued a bench decision on August 16, 2019. He summarized the testimony and stated that he had taken judicial notice of P2/16-19CR, wherein mother "received three years probation for criminal neglect and cruelty to a child[,]" a case involving another one of her children to whom she no longer has any legal rights. He noted that mother's other two children had permanency under the terms of guardianships. The trial justice found by clear and convincing evidence that the credibility of Ms. Carpenter and Ms. Ahles "far outweigh[ed] that of [mother]" on the issue of whether mother was referred to a parent/child evaluation and refused. He also found that mother did not engage fully with the Family Services program or remain free of criminal activity, both of which were requirements of her service plans. He found that mother had "failed to provide Gelvin with a minimum degree of care, supervision or guardianship" and therefore, neglected him. He found that, prior to Gelvin's removal from his mother's care, DCYF had "exercised reasonable efforts to prevent or eliminate the need to remove him from the care of his mother" and that there was not "a reasonable probability" that Gelvin could "be able to be returned to his mother's care within a reasonable period of time[.]" Additionally, he found that it was not in Gelvin's best interest to be placed with mother, that mother

---

the impropriety of such a statement in closing arguments, which "should focus on the evidence educed at trial" and should not become an opportunity for counsel to interject themself into the case in this way. *State v. Farley*, 962 A.2d 748, 757 (R.I. 2009).

was unfit, and that Gelvin was thriving with the foster parents who could offer him permanency. For those reasons, the trial justice found that it was in Gelvin's best interest that mother's parental rights be terminated.

A decree terminating mother's parental rights entered on August 26, 2019. Mother filed a timely notice of appeal to this Court. On appeal, mother asserts that the trial justice made three determinations that were in error: (1) that mother was an unfit parent and Gelvin's safe return to her within a reasonable time was improbable; (2) that DCYF met its burden to show that it made reasonable efforts to achieve reunification between mother and her son; and (3) that it was in Gelvin's best interest to "forever sever his relationship with his mother."

**Termination of Parental Rights**

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019) (quoting *In re Amiah P.*, 54 A.3d 446, 451 (R.I. 2012)). "These findings are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Amiah P.*, 54 A.3d at 451). "Such findings must be supported by clear and convincing evidence." *Id.* "Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *Id.* (quoting *In re Amiah P.*,

54 A.3d at 451). "Before terminating a parent's rights to his or her child, the Family Court justice must find that the parent is unfit." *Id.* (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451). "However, once the Family Court justice determines parental unfitness, the best interests of the child outweigh all other considerations." *Id.* (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451).

In the instant case, the petition to terminate respondent's parental rights was filed pursuant to § 15-7-7(a)(3), which states:

> "(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:
>
> "* * *
>
> "(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

It is undisputed that Gelvin had been in the legal care of DCYF for more than twelve months at the time of the filing of the petition. We therefore will address

each of mother's contentions regarding the other requirements for the granting of a petition for the termination of parental rights in the Family Court.

## A

## Parental Fitness

"It is indeed a basic principle that, 'before parental rights may be terminated, a specific finding of parental unfitness must be made.'" *In re James H.*, 181 A.3d 19, 26 (R.I. 2018) (quoting *In re Max M.*, 116 A.3d 185, 193 (R.I. 2015)). "A parent is deemed unfit when the parent has 'exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time.'" *In re Violet G.*, 212 A.3d at 166 (brackets omitted) (quoting § 15-7-7(a)(2)(vii)). In addition, "a parent's lack of interest in his or her child evidenced by an unwillingness to cooperate with DCYF services can be a basis for a finding of unfitness." *In re James H.*, 181 A.3d at 26-27 (quoting *In re Max M.*, 116 A.3d at 194).

The trial justice's finding of unfitness is well-supported by the record in the present case. Mother did not comply with her service plan when she failed to avoid criminal activity and was arrested the day before her first planned overnight visit with her son. In addition, she had an unsupervised visit with her son, which she knew was against the court order in effect at that time. She admitted to both instances during trial. Finally, although she sought therapy, mother did not fully

engage with her therapist which, given the two instances mentioned above, was particularly necessary for her to become a fit parent for Gelvin. Thus, the trial justice's finding of unfitness is supported by clear and convincing, legally competent evidence.

## B

## Reasonable Efforts

Section 15-7-7(a)(3) "mandates that DCYF establish by clear and convincing evidence that it offered 'services that amount to a reasonable effort to correct the situation that led to the child's removal' from the parent's care." *In re Violet G.*, 212 A.3d at 167 (brackets omitted) (quoting *In re Lauren B.*, 78 A.3d 752, 760 (R.I. 2013)). DCYF need not "demonstrate that it took 'extraordinary efforts.'" *Id.* (brackets omitted) (quoting *In re Lauren B.*, 78 A.3d at 760). "Rather, the law requires that DCYF employ 'reasonable efforts,' and the reasonableness of such efforts 'must be determined from the particular facts and circumstances of each case.'" *Id.* (quoting *In re Joseph S.*, 788 A.2d 475, 478 (R.I. 2002)).

The trial justice found that DCYF had referred mother to services in the form of the Boys Town program. He also found credible the testimony of Ms. Carpenter and Ms. Ahles regarding DCYF's attempt to refer mother to a parent/child evaluation, notwithstanding mother's statements to the contrary. Such a finding is entitled to "a substantial amount of deference * * * due to the fact that the trial justice

has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." *Tsonos v. Tsonos*, 222 A.3d 927, 934 (R.I. 2019) (quoting *In re Estate of Ross*, 131 A.3d 158, 167 (R.I. 2016)). Additionally, the record reveals that DCYF worked both toward increasing mother's visitation and transitioning to unsupervised visitation, which shows a progression toward reunification, as contemplated by the first two service plans. Although DCYF certainly did not engage in "extraordinary efforts," the trial justice's finding that DCYF engaged in "reasonable efforts" to reunify mother and Gelvin is likewise supported by legally competent evidence.[4]

## C

### Best Interests of the Child

"Once DCYF has demonstrated parental unfitness and has shown that it made reasonable efforts at reunification, the analysis then shifts to the overarching issue of the best interests of the child, a determination that outweighs all others." *In re Violet G.*, 212 A.3d at 167 (quoting *In re Kristina L.*, 520 A.2d 574, 580 (R.I. 1987)). This Court is always mindful of the import "of the 'significance of severing the bond between parent and child[.]'" *Id.* at 168 (quoting *In re Alexis L.*, 972 A.2d 159, 170

---

[4] We caution DCYF that, although mother had a history with the department involving her other children, it was not a forgone conclusion that mother would be an unfit parent to Gelvin. DCYF is required to make reasonable efforts to reunify *each* child with his or her parent.

- 12 -

(R.I. 2009)). However, it is undeniable that the best interests of the child "outweigh all other considerations." *In re Briann A.T.*, 146 A.3d 866, 874 (R.I. 2016) (quoting *In re Brooklyn M.*, 933 A.2d 1113, 1126 (R.I. 2007)).

The trial justice found that Gelvin had bonded with his foster family, who could offer him permanency if the respondent's parental rights were terminated. He further found that it was unlikely that Gelvin could be placed with the respondent within a reasonable amount of time, given the justice's other findings regarding the respondent's unfitness. The trial justice's finding that the respondent's termination of parental rights was in Gelvin's best interest is, like his other findings, supported by legally competent evidence.

## Conclusion

For the reasons set forth in this opinion, we affirm the decree appealed from and return the record in this case to the Family Court.

Chief Justice Suttell did not participate.

# STATE OF RHODE ISLAND
## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Gelvin B. |
| **Case Number** | No. 2019-443-Appeal<br>(P 18-4947) |
| **Date Opinion Filed** | May 26, 2021 |
| **Justices** | Goldberg, Robinson, Lynch Prata, and Long JJ. |
| **Written By** | Associate Justice Melissa A. Long |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Stephen J. Capineri |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Benjamin Copple<br>Department of Children, Youth and Families<br><br>Lauren E. Nixon<br>Court Appointed Special Advocate<br><br>For Respondent:<br><br>Charlene E. Pratt<br>Office of the Public Defender<br><br>Kara J. Maguire<br>Office of the Public Defender |