May 27, 2022

**Supreme Court**

No. 2021-35-Appeal.
(W 17-3811)

In re Rachelle L-B.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or Email opinionanalyst@courts.ri.gov of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Rachelle L-B.  :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Lynch Prata, for the Court.**  This case came before the Supreme Court on May 3, 2022, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  The respondent father, Michael L., appeals from a decree entered in the Family Court terminating his parental rights to his daughter, Rachelle L-B.[1]  After hearing the parties' arguments and thoroughly reviewing the record, we are satisfied that cause has not been shown.  For the reasons set forth in this opinion, we affirm the decree of the Family Court.

---

[1] The petition to terminate parental rights was filed against the respondent and Rachelle's mother, Marisa B.  Marisa's parental rights were terminated pursuant to G.L. 1956 § 15-7-7(a)(2)(iii) and (a)(3).  Marisa did not file a notice of appeal, and she is mentioned in this opinion only as is necessary.

## Facts and Travel

Rachelle was born on July 12, 2013. Two days later, Rachelle was brought to the attention of the Department of Children, Youth, and Families when the hospital placed Rachelle on a hold because she was born with withdrawal symptoms and was being treated with medication to stabilize her condition. The hospital reported that Rachelle's mother, Marisa B., had tested positive for cocaine and opiates. A DCYF caseworker was assigned to Rachelle's case, and DCYF filed a neglect petition on July 15, 2013, alleging that (1) her parents failed to provide Rachelle a minimum degree of care and (2) Rachelle was "without proper parental care and supervision."[2] DCYF was granted temporary custody of Rachelle; she was discharged from the hospital, released to DCYF custody, and was immediately placed in nonrelative foster care.

During the following fourteen months, DCYF developed joint service plans that, for respondent, addressed substance abuse, anger management, and a stable living environment. The DCYF caseworker testified that respondent was referred to the Phoenix House for a substance-abuse evaluation, but that DCYF never obtained a report from the service provider because respondent withdrew his release. The caseworker further testified that respondent was referred to the Batterers

---

[2] We take judicial notice of the parallel proceeding in the Family Court involving DCYF's neglect petition and draw pertinent facts from that case.

Intervention Program for anger management, which he participated in and successfully completed.

By September 2014, respondent was engaging in weekly two-hour supervised visitations with Rachelle.[3]  Rachelle was ultimately reunified with her parents on February 23, 2015, on the condition that the parents continue substance-abuse treatment and screening.  The service plan developed by DCYF during that time required Rachelle's parents to provide for her basic needs, including financial, housing, medical, and participation in Early Intervention; obtain and maintain a substance-free lifestyle; and provide a stable living environment.

On June 15, 2015, Rachelle was evaluated by Easter Seals Early Intervention "due to history of prenatal drug exposure and concern with her expressive language development."  The evaluation showed that Rachelle had "a significant delay in her expressive language and a mild delay with her receptive language[,]" and an individualized family service plan was developed with respondent and Marisa. According to the DCYF caseworker, DCYF had also received reports that Rachelle "was going to school dirty, and she appeared neglected[.]" In furtherance of maintaining a substance-free lifestyle, respondent received outpatient treatment at Meadows Edge Recovery Center from December 2014 until August 2015.  The

---

[3] The respondent ultimately admitted to neglect on October 28, 2014.

respondent successfully completed his treatment, and his counselor reported that he "attended sessions, was compliant, and all of his toxicology screens were negative."

On May 17, 2016, fifteen months after Rachelle was reunified with her parents, the Family Court ordered that, in accordance with DCYF's recommendation, Rachelle "be removed from the home forthwith." DCYF had reported to the Family Court that Rachelle had missed six Early Intervention appointments. After Early Intervention issued a notice that Rachelle would be discharged from the program if they did not hear from respondent or Marisa within ten days, Marisa brought Rachelle to the next appointment twenty minutes late. During that time, and at all times relevant hereto, respondent lived with and was in a relationship with Marisa, and he testified that he never separated from her.[4]

Per DCYF's recommendation, Rachelle was placed in nonrelative care, and her parents were afforded supervised weekly one-hour visits. A service plan developed five days after Rachelle's removal identified the following behavioral changes required of respondent: (1) achieve maximum potential of readiness for school for Rachelle by participating in Early Intervention, meeting with a speech

---

[4] During that time, DCYF was also concerned with Marisa's noncompliance with maintaining a substance-free lifestyle. Specifically, Marisa's records from Meadows Edge reveal that, on March 15, 2016, DCYF was informed that Marisa was being discharged from the treatment center due to her lack of participation in the program. Meadows Edge further reported that Marisa was not doing random screens because she insisted that she no longer needed to do them.

pathologist, keeping all scheduled appointments, and providing age-appropriate toys; (2) provide for Rachelle's basic needs, including financial, housing, and medical; and (3) maintain a substance-free lifestyle by participating and cooperating with treatment and undergoing random screening. The DCYF caseworker testified that the case plan "was pretty basic [in] what [the parents] needed to do, and they just needed to be consistent[.]"

On August 4, 2016, respondent and Marisa began services with the Boys Town In Home Family Services Program. Between that date and October 31, 2016, a Boys Town family consultant observed eleven visits between Rachelle and her parents. The consultant informed the Family Court that during those visits the parents "provided a safe environment for Rachelle"; "interact[ed] appropriately with Rachelle"; and showed "her affection in the form of hugs, kisses, and verbal expression." The consultant stated that she met with the parents to review parenting skills and that she observed both respondent and Marisa implementing those strategies to assist them in effectively parenting Rachelle.

Rachelle was reunified with her parents again on October 31, 2016. The service plan dated December 9, 2016, continued to require the same behavioral changes from respondent, including achieving maximum school readiness potential for Rachelle, providing for her needs, improving safety and understanding the stages of development, and maintaining a substance-free lifestyle. The DCYF caseworker

testified that she made numerous unannounced visits between October 2016 and February 2017 and that "the home consistently was dark," and Rachelle, who was almost four years old at the time, was still sleeping in a crib.

In or around February 2017, the parents were directed to complete the Key Program Positive Parenting Program for home-based services that would assist them with parenting and organizational skills. Around that same time, the Family Court requested that DCYF assist in locating a toddler bed for Rachelle. The DCYF caseworker testified that a toddler bed was promptly provided, but that Marisa told her the toddler bed was put in the basement because Rachelle was getting out of it.

The DCYF caseworker testified that by March 2017 she was concerned about Rachelle because the caseworker was "receiving calls continuously from Meadows Edge that [the] parents weren't complying with services or urine screens." A permanency hearing was held in the Family Court on April 25, 2017. During the hearing, DCYF's attorney represented to the court that "Rachelle is going to school smelling like feces. She is disheveled." DCYF requested that Rachelle immediately be removed from her parents' care. Likewise, an attorney from the Court Appointed Special Advocates (CASA) requested that DCYF be allowed to exercise its discretion and remove Rachelle.

The respondent was not present at the March hearing, but DCYF requested that he submit to a substance-abuse evaluation. The DCYF caseworker also reported

to the court "that there was a domestic violence incident" wherein respondent came home intoxicated and pushed Marisa. DCYF represented that it had concerns about planning for respondent to be the primary caretaker if Marisa were ordered out of the home, because respondent had previously stated that he could not be the primary caretaker given that he works full time and the department was concerned that he would not "have the protective capacity to not allow mother to be in the home."[5] The Family Court ordered removal of Rachelle from her parents' home and further ordered respondent to submit to a substance-abuse evaluation. Rachelle was placed in nonrelative foster care.

After Rachelle's third removal from her parents' care, the objectives in the service plan continued to remain the same, including participating in programs to assist with parenting and maintaining a substance-free lifestyle by engaging with a treatment center and submitting to random urine screens. On June 16, 2017, respondent's counselor at Meadows Edge reported that he was maintaining good attendance, but that several screens were positive for amphetamines and it was

---

[5] The respondent testified that during the times relevant to this matter he was a commercial fisherman and performed drywall and "odd jobs." He testified that being a commercial fisherman required him to work "[a] lot." Specifically, respondent testified that year-round he would be on "back-to-back-to-back trips, maybe with two days off, sometimes. Sometimes it's three days out fishing. Sometimes it's five days or six[.]" The respondent admitted that, when Rachelle was first reunified with her parents, he worked "[a]s much as possible[,]" thereby being away often and leaving Marisa as the primary caretaker.

unconfirmed whether respondent had a valid prescription for that drug. The respondent was clinically discharged from Meadows Edge on August 29, 2017, due to lack of contact. Meadows Edge reported that he had failed to complete any random screens since June 2017. The parents also failed to successfully complete the court-ordered Key Program Positive Parenting Program. Between April 25, 2017, and October 10, 2017, respondent visited with Rachelle seven times, and during the visits DCYF characterized his behavior as "argumentative, and [he] makes negative comments about the Department and staff in front of his child that are inappropriate."

On October 10, 2017, DCYF filed a petition in the Family Court seeking to terminate respondent's parental rights with respect to Rachelle, based on G.L. 1956 § 15-7-7(a)(2)(iii) (unfitness because of chronic substance abuse); § 15-7-7(a)(2)(vii) (conduct seriously detrimental to the child); and § 15-7-7(a)(3) (twelve months in DCYF custody without substantial probability of child's safe return within a reasonable period).[6] A trial on DCYF's petition was conducted in

---

[6] The relevant provisions of § 15-7-7 are provided below for reference purposes:

> "Termination of parental rights.
>
> "(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any

- 8 -

subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:

"  *  *  *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:

"  *  *  *

"(iii) The child has been placed in the legal custody or care of the department for children, youth, and families and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a permanent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem;

"  *  *  *

"(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time;

"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the

the Family Court on various dates between November 13, 2018, and July 30, 2019. In addition to receiving documentary evidence, the trial justice heard testimony relevant to the present appeal from two DCYF caseworkers assigned to Rachelle's case, Rachelle's therapist, Rachelle's classroom teacher, an Early Intervention family service coordinator, respondent's substance-abuse counselor, and respondent.

On November 25, 2020, the trial justice issued a 117-page written decision terminating respondent's parental rights to Rachelle. In so doing, and after thoroughly reviewing the testimony and relevant trial exhibits, the trial justice found that respondent was unfit because Rachelle had been in the legal custody or care of DCYF for twelve months and respondent failed to pursue the services offered him to correct the issues that led to Rachelle's removal.[7] Specifically, the trial justice found that over the course of four years DCYF had developed eight case plans, all with the goal of reunifying or maintaining Rachelle with her parents. She reviewed the myriad services that were offered to respondent and found that "more than reasonable efforts" were made to provide the parents with services and that the case

parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

[7] The trial justice found that DCYF failed to prove by clear and convincing evidence that respondent "has a chronic substance abuse problem that would prevent Rachelle from returning to his custody."

plan goals were not successfully completed. The trial justice concluded that DCYF proved "by clear and convincing evidence that there is not a substantial probability that Rachelle will be able to safely return to Respondent parents' care within a reasonable time considering her age and her need for a permanent home."

The trial justice then found that Rachelle had been in a preadoptive foster home since fall 2017 and had bonded to that family. The trial justice noted that Rachelle expressed to her therapist that she wanted to remain with her foster parents. Accordingly, the trial justice found by clear and convincing evidence that it was in the child's best interest that respondent's parental rights be terminated.

The decree terminating respondent's parental rights was entered on December 1, 2020.[8] The respondent timely appealed.

## Standard of Review

It is well settled that this Court "reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Domenic B.*, 260 A.3d 1108, 1111

---

[8] Although we applaud the meticulous decision authored by the trial justice, we pause to note that we are troubled by the fact that more than three years elapsed between the date on which DCYF filed the petition to terminate parental rights and the date on which a decision was rendered. At oral argument before this Court, counsel for DCYF represented that the trial was segmented over the course of nineteen dates because of scheduling issues with all counsel involved. We take this opportunity to remind both the bench and the bar that parties are entitled to expeditious resolution of litigation, especially when constitutionally protected rights and the interest of a child are involved.

(R.I. 2021) (quoting *In re Elana W.*, 249 A.3d 287, 292 (R.I. 2021)). The Family Court justice's findings "are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Manuel P.*, 252 A.3d 1211, 1218-19 (R.I. 2021)).

## Discussion

On appeal, respondent maintains that the trial justice erred in finding (1) that respondent was unfit to parent Rachelle and that there was no substantial probability that Rachelle could be placed in respondent's care within a reasonable period of time; (2) that DCYF made reasonable efforts to achieve reunification; and (3) that it was in Rachelle's best interests to terminate respondent's parental rights.

The Family Court must find that a parent is unfit before terminating his or her parental rights. *E.g.*, *In re Elana W.*, 249 A.3d at 293. In addition, DCYF must prove by clear and convincing evidence that it made "reasonable efforts to encourage and strengthen the parental relationship so that the child may safely return to the family." *In re Jose Luis R.H.*, 968 A.2d 875, 882 (R.I. 2009); *see* § 15-7-7(b)(1).

Here, the trial justice found, by clear and convincing evidence, that respondent was unfit as a parent and that DCYF had made reasonable efforts to reunify respondent with his daughter. This finding is supported by the record, which reveals that eight case plans were developed for respondent over the course of nearly four

- 12 -

years, all of which had the goal of either reunification or to maintain Rachelle in her parents' home. Those case plans required respondent to, among other things, maintain a substance-free lifestyle, provide for Rachelle's basic needs, and assist in achieving maximum school readiness potential for Rachelle. In an effort to help respondent with successfully achieving the case plan goals, DCYF made numerous referrals to assist respondent with substance abuse, parenting, and Rachelle's educational goals. Despite DCYF's statutorily required efforts, respondent did not comply with the case plans. *See In re James H.*, 181 A.3d 19, 27 (R.I. 2018) ("[R]efusal to cooperate with the objectives of the case plans constitutes clear and convincing evidence of [a] lack of interest in [the child] and, as such, could properly serve as a basis for a finding of parental unfitness.").

Specifically, the record reveals that, in furtherance of the goal of maintaining a substance-free lifestyle, DCYF referred respondent to Phoenix House and Meadows Edge. DCYF was never able to obtain reports from Phoenix House because respondent withdrew his release. The respondent did successfully complete outpatient treatment at Meadows Edge in August 2015, but by April 2017 DCYF was requesting that respondent undergo another substance-abuse evaluation because the DCYF caseworker reported to the Family Court that it was disclosed to DCYF that respondent recently "came home after being intoxicated" and "got into a fight" with Marisa and "he pushed [her]." The respondent made initial contact with

Meadows Edge but had positive screens and was eventually clinically discharged due to lack of contact. The respondent's contention that the second substance-abuse evaluation was unnecessary does not excuse his failure to comply with the case plan objectives. The Family Court ordered respondent to undergo another substance-abuse evaluation, but he willfully ignored that order. *See In re Julian D.*, 18 A.3d 477, 485 (R.I. 2011) (holding that a respondent-father's refusal to complete a sexual-offender counseling program as required in DCYF's case-plan goals constituted a precondition to reunification and prevented child from being able to return to father "any time soon").

As to providing for Rachelle's basic needs, effectively parenting her, and maximizing her school preparedness, respondent seemed to have little involvement or interest in the services DCYF attempted to put in place. Rachelle was referred to the Early Intervention Program at a young age to assist with her development. According to the Early Intervention family service coordinator, "Early Intervention is a coaching model" that "encourage[s] parents to be involved in visits[.]" The family service coordinator testified that she met respondent only once and the Early Intervention records reveal that six appointments were missed. The respondent testified that he did not help with the homework provided by Early Intervention because he "was probably fishing." Although respondent testified that his wife was mainly responsible for taking Rachelle to medical appointments, it is clear to us that

he was content to leave parenting to Marisa, to the detriment of Rachelle's development.

Moreover, respondent failed to successfully complete the Key Program Positive Parenting Program. The respondent also took no action in response to concerns relayed by Rachelle's teachers regarding her attendance, appearance, cleanliness, and health. The respondent utterly failed to demonstrate an effort to fully engage in the services provided by DCYF. *See In re Elana W.*, 249 A.3d at 294 ("Merely completing some of the referred programs, without the accompanying behavior change, is not enough to support reunification.").

On appeal, respondent seeks to excuse his failure to achieve the case plan goals by arguing that it was incumbent upon DCYF to "propose a case plan allowing [him] to individually parent Rachelle while [Marisa] addressed her substance abuse issues." The respondent and Marisa were each represented by their own attorney throughout the proceedings leading up to the termination petition. Nothing in the record reflects that respondent's counsel suggested or pursued separate case planning. Moreover, respondent testified during the termination proceedings that there was never a time in his mind that he would leave Marisa and take Rachelle to parent alone, and he stated that, if asked to, he "maybe" would have separated from Marisa for a little while in order to reunify with Rachelle. There is also nothing in the record to suggest that respondent undertook any efforts to address his wife's

substance-abuse and parenting issues. Based on the foregoing, we are satisfied that there is sufficient evidence in the record to support the trial justice's finding that respondent was unfit given his failure to engage in the services provided by DCYF, and that DCYF made reasonable efforts at reunification.

Once a determination of parental unfitness has been made by the Family Court, the trial justice must turn to the best interests of the child, which "outweigh all other considerations." *In re Domenic B.*, 260 A.3d at 1111 (quoting *In re Elana W.*, 249 A.3d at 293). The trial justice found that Rachelle was in what would be a preadoptive home if she was freed for adoption and had established a familial connection in her foster home. At the time of the trial in Family Court, Rachelle had resided in nonrelative foster care continuously for over a year; prior to that, she underwent numerous transitions from her parents' care to nonrelative foster care, including at least two different foster homes.[9] Rachelle's therapist wrote a letter to DCYF in September 2017, opining that "it is crucial that permanency for Rachelle in a stable loving home be established as soon as possible." We are satisfied that the trial justice appropriately determined that the termination of the respondent's parental rights was in the best interest of Rachelle. *See In re Alexis L.*, 972 A.2d 159,

---

[9] During oral argument before this Court, counsel for DCYF represented that the respondent had not called to inquire about Rachelle's well-being for more than three years. This is confirmed by a letter from DCYF to the Family Court that was filed after the present appeal was docketed. Rachelle has now been in the same preadoptive home for more than four years.

170 (R.I. 2009) (explaining that "[a]lthough this Court is ever cognizant of the significance of severing the bond between parent and child, it is in the best interests of children to have a safe and nurturing environment in which to live, learn[,] and grow").

## Conclusion

For the reasons set forth in this opinion, we affirm the decree of the Family Court. The record in this case may be returned to the Family Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Rachelle L-B. |
| **Case Number** | No. 2021-35-Appeal. (W 17-3811) |
| **Date Opinion Filed** | May 27, 2022 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Washington County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Sandra A. Lanni |
| **Attorney(s) on Appeal** | For Petitioner: Dianne L. Leyden Department of Children, Youth, and Families Laurel C. Ferrelli Court Appointed Special Advocate |
| | For Respondent: Camille A. McKenna Office of the Public Defender |